193 N.J. Super. 113 (1984)
472 A.2d 577
JAMES FISCHER AND GENEVA FISCHER, PLAINTIFFS-RESPONDENTS,
v.
JOHNS-MANVILLE CORPORATIONS AND BELL ASBESTOS MINES, LTD., DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued November 29, 1983.
Decided January 31, 1984.
*114 Before Judges BOTTER, PRESSLER and O'BRIEN.
David R. Gross argued the cause for appellants Johns-Manville Corporations (Budd, Larner, Kent, Gross, Picillo & Rosenbaum, attorneys; David R. Gross, on the brief).
William J. Brennan, III, argued the cause for appellant Bell Asbestos Mines, Ltd. (Smith, Stratton, Wise, Heher & Brennan, attorneys; William J. Brennan, of counsel; Wendy L. Mager and Thomas E. Kopil, on the brief).
*115 Karl Asch argued the cause for respondents James R. Fischer and Geneva Fischer (Karl Asch, attorney; Karl Asch and Ronald S. Suss, on the brief).
The opinion of the court was delivered by PRESSLER, J.A.D.
This is a strict liability case. Defendants, suppliers of asbestos materials, appeal from a jury verdict awarding compensatory and punitive damages to plaintiff James R. Fischer for the pulmonary disease he suffered as a result of his prolonged exposure to asbestos and awarding compensatory damages to his wife, plaintiff Geneva Fischer, on her per quod claim. The primary issue raised on this appeal is whether punitive damages are recoverable in a products liability action tried on principles of strict liability. Although New Jersey has not yet considered this question, it has been recently addressed by many of our sister states, all of which have concluded that there is no fundamental conceptual or public policy bar to application of customary punitive damages principles in these actions. We agree with this conclusion. We are also satisfied that the punitive damages verdict here rested upon an adequate evidential base and proper instructions from the trial judge. Accordingly, the verdict is affirmed.
By the time trial commenced, this multi-party, multi-issue litigation had been significantly reduced in scope. The sole remaining plaintiffs were the Fischers and the sole issue on which they elected to proceed was strict liability based on defendants' failure to warn of health hazards related to exposure to asbestos. The number of defendants had been reduced to three: Johns-Manville,[1] Bell Asbestos Mines, Ltd. (Bell), and *116 Celotex Corporation. The claims against Celotex were dismissed at the close of plaintiffs' case, and the verdict was returned against Johns-Manville and Bell alone. The compensatory verdicts in favor of Mr. and Mrs. Fischer, in the total amount of $86,000 and $5,000 respectively, were apportioned by the jury on the basis of 80% against Johns-Manville and 20% against Bell. In addition, the jury awarded Mr. Fischer punitive damages against Johns-Manville in the amount of $240,000 and against Bell in the amount of $60,000.
From the proofs, the jury could have found that plaintiff James Fischer worked for Asbestos, Ltd. in Passaic County from 1938 through the end of 1942 and for an additional four-month period in 1945. His duties required him to handle asbestos in various forms, causing him regularly to inhale asbestos dust. He never wore any protective clothing or apparatus and was never given any cautionary warning or instruction in the safe handling of asbestos either by his employer or by the suppliers of the asbestos materials, who were identified at trial as Johns-Manville and Bell. After leaving Asbestos, Ltd., plaintiff was employed both in farm work and in other industrial employments, none of which involved exposure to substances deleterious to the lungs.
Mr. Fischer's pulmonary disease first manifested itself in 1977 when it was determined that he was suffering from asbestos-related problems. He was placed on medication which ultimately led to such side effects as diabetes, rheumatoid arthritis and osteoporosis. In 1979 he was hospitalized suffering from bronchitis with borderline pneumonia but was eventually able to return to work. In February 1980 he had a heart attack and has been unable to work since that time. He was then 61 years old. His total disability was attributed by his treating physician as 30% due to chronic obstructive lung disease due to smoking, 60% *117 due to asbestos exposure and the side effects of the medication he took to alleviate those pulmonary problems, and 10% due to the heart condition.
There is no doubt from this record that plaintiff proved a strict liability action against both defendants based on their failure to warn of the hazards of prolonged exposure to asbestos. See Beshada v. Johns-Manville Products Corp., 90 N.J. 191 (1982). Thus, the compensatory damages award is not substantially in issue. Johns-Manville does not challenge it at all, and we are satisfied that Bell's challenges, hereafter discussed, are without substantial merit.
It was the holding of Beshada that a supplier of asbestos could not, by relying on the "state of the art," be relieved of the consequences of his failure to warn because of his lack of knowledge of the danger of the product at the time of its distribution. Here the issue was not state of the art but actual knowledge, the essential controversy being whether these defendants did in fact have knowledge of the hazards of asbestos during the time of plaintiff's exposure some 45 years ago. Plaintiffs based their punitive damage claim on the contention that defendants knew of these hazards as early as the 1930's and had made a conscious business decision to withhold this information from the public. They claimed that defendants, with full knowledge of the risks, deliberately chose not to give those warnings to users of the product which might have enabled them to obtain protection from prolonged exposure. This conduct, plaintiffs alleged, constituted an outrageous and flagrant disregard of the substantial health risks to which defendants subjected the public and justified the imposition of punitive damages. The jury evidently agreed. Our review of the record satisfies us that there was substantial proof adduced to support these factual contentions and the jury's acceptance of them.
The proofs respecting Johns-Manville were, indeed, overwhelming. Johns-Manville, in its answers to interrogatories, which were read to the jury, admitted that

*118 [t]he corporation became aware of the relationship between asbestos and the disease known as asbestosis among workers involved in mining, milling and manufacturing operations and exposed to high levels of virtually 100% raw asbestos fibers over long periods of time by the early 1930s. The corporation has followed and become aware of the general state of the medical art relative to asbestos and its relationship to disease processes, if any.
In response to plaintiffs' requests for admissions, also read to the jury, it admitted that in the early 1940's it knew that asbestos "was dangerous to the health" of those industrial workers who were exposed to excessive amounts of the material. Plaintiffs, moreover, produced as a witness Dr. Daniel C. Braun, president of the Industrial Health Foundation, a research organization which develops, accumulates and disseminates information about occupational diseases. Dr. Braun testified that Johns-Manville has been a member of the Foundation since 1936. He also testified that since 1937 the Foundation has sent to its members a monthly digest of articles appearing in scientific journals which relate to occupational disease. Relevant portions of the digests, which were admitted into evidence, included references to eleven scientific articles published between 1936 and 1941 documenting the grave pulmonary hazards of exposure to asbestos and discussing measures which could be taken to protect workers. Plaintiffs also proved that as early as 1933 claims were being made against Johns-Manville by asbestos workers, and in November of that year the Executive Committee of its Board of Directors passed a resolution authorizing the president of the corporation
... to enter into negotiations for the settlement of any actions now pending or which may be hereafter brought against the Corporation by former employees founded upon alleged injury or disease resulting from their employment by the Corporation and, in his discretion, to settle any such cases upon such terms as he shall, in his uncontrolled discretion, deem advisable and for the best interests of the Corporation.
In December of that year high-level representatives of Johns-Manville met with officials of Raybestos-Manhattan, another major asbestos supplier, to discuss steps which the industry as a whole might take to reduce employee risk. It appears, however, that Johns-Manville never did arrange for or participate in any *119 industry-wide meetings on the subject. The minutes of that 1933 meeting also confirm the participants' view that at least for the time being "our past policy of keeping this matter confidential is to be pursued."
Perhaps most damning of all is the so-called Sumner Simpson correspondence of 1935 and 1941. Simpson was president of Raybestos. In October 1935, he received a letter from a Miss Rossiter, editor of the trade periodical Asbestos, suggesting that despite Simpson's earlier requests, made "for certain obvious reasons," that articles relating to asbestosis not be published, perhaps the time had come to print a positive article about industry efforts to reduce the risk in order "to combat some of the rather undesirable publicity given to it [asbestosis] in current newspapers." Simpson thereupon sent a copy of the letter to Johns-Manville's secretary, Vandiver Brown, expressing his opinion that "the less said about asbestos, the better off we are." Brown's reply stated in part:
I quite agree with you that our interests are best served by having asbestosis receive the minimum of publicity. Even if we should eventually decide to raise no objection to the publication of an article on asbestosis in the magazine in question, I think we should warn the editors to use American data on the subject rather than English. Dr. Lanza has frequently remarked, to me personally and in some of his papers, that the clinical picture presented in North American localities where there is an asbestos dust hazard is considerably milder than that reported in England and South Africa.
Some seven years later, in 1941, Brown wrote to Simpson regarding Miss Rossiter's proposal to include in a forthcoming issue of Asbestos a review of a book apparently linking asbestos exposure with pneumoconiosis. Noting that "a number of her subscribers would dislike an article on this subject in the trade magazine of the Asbestos Industry," Brown expressed the view that as a result of his communications with Miss Rossiter, "I am inclined to believe she will omit any review of the book in question."
Finally, plaintiffs' attorney read into evidence excerpts of the deposition testimony of Kenneth W. Smith, a physician who started to work for Johns-Manville in 1944 and eventually *120 became Medical Director of its Canadian corporation. Dr. Smith testified that from the beginning of his employment he saw persons with asbestosis "on a regular and frequent basis" and frequently made recommendations that such employees receive job reclassifications which would remove them from continued exposure to asbestos dust.
With respect to the extent and timing of Bell's knowledge, the sole proof was this response to plaintiffs' request for admissions:
This defendant admits that since the mid-1930's, it has been generally known to the Canadian asbestos mining industry, which includes this defendant, that prolonged exposure to high concentrations of airborne asbestos fibers was associated with possible health hazards.
On appeal, neither Bell nor Johns-Manville challenges either the amount of the punitive damages allowed or the trial judge's instructions respecting the standards which the jury was to apply in considering an award of punitive damages. Their challenge is rather based on the contentions first, that punitive damages are not allowable at all in product liability actions and, second, that even if they are, the proofs in respect of each were inadequate to meet the necessary standard of outrageous conduct in deliberate disregard of the rights of others. We have considered these contentions and are constrained to reject them both.
As to the first, we conclude that in an appropriate case, punitive damages may be awarded in a product liability action based on strict liability. It is well settled in this jurisdiction that while damages in tort actions are generally intended only to compensate, nevertheless punitive damages are allowable in exceptional and egregious instances for the purpose of punishing the tortfeasor and deterring both him and others from like conduct. The standard of egregiousness usually implies "that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences." Berg v. Reaction Motors Div., 37 N.J. 396, 414 (1962). See also Leimgruber v. Claridge Assoc., Ltd., 73 N.J. 450, 454 (1977). In what is apparently the only linking of the *121 principles of punitive damages and strict liability in a reported decision in this state, Berg cautions that punitive damages "are not to be applied in the ordinary unaggravated tort case whether it be grounded on strict liability or fault." Berg, 37 N.J. at 413. The implication of this admonition would clearly seem to be its obverse, namely, that punitive damages are allowable in the exceptional and aggravated tort case "whether it be grounded on strict liability or fault." Defendants argue against this rather obvious proposition on theoretical and public policy grounds, all of which have been considered and rejected by the courts of other jurisdictions and, in our view, correctly so.
As we have noted, the availability of punitive damages in a products liability case tried on strict liability principles is an issue which has not previously been decided in a reported decision of our courts. Prior to 1976, the issue arose in California and Illinois. Neither jurisdiction found any reason to except strict products liability cases from customary punitive damages rules. See Toole v. Richardson-Merrell, Inc., 251 Cal. App.2d 689, 60 Cal. Rptr. 398 (Ct.App. 1967), and Moore v. Jewel Tea Co., 116 Ill. App.2d 109, 253 N.E.2d 636 (App.Ct. 1969), aff'd per curiam 46 Ill.2d 288, 263 N.E.2d 103 (Sup.Ct. 1970). The question was also considered by the Second Circuit, applying New York law, in Roginsky v. Richardson-Merrell, Inc., 378 F.2d 832 (2d Cir.1967). It was Judge Friendly's conclusion that even if New York were to allow punitive damages in these cases, plaintiff's proofs failed to reach the level of egregiousness required by that state's law as a condition of such an award. In dicta, however, he expressed considerable concern over the potential economic impact of allowing punitive damages against manufacturers of defective products.
The signal event of 1976 was the appearance of a law review article which argued persuasively in favor of allowing punitive damages in appropriate products liability cases, effectively countering the public policy concerns expressed in Roginsky. See Owen, "Punitive Damages in Products Liability Litigation," 74 Mich.L.Rev. 1257 (1976). Following the publication of Professor *122 Owen's article, the issue has been raised in at least twenty jurisdictions across the country. Virtually all of them, and many in reliance on the Owen article, have found neither a conceptual nor a public policy bar to the allowance of punitive damages in products liability actions. These jurisdictions include: Alaska  Sturm, Ruger and Co., Inc. v. Day, 594 P.2d 38 (Sup.Ct.Alaska 1979), cert. den. 454 U.S. 894, 102 S.Ct. 391, 70 L.Ed.2d 209 (1981) (revolver); Arkansas  Forrest City Mach. Works, Inc. v. Aderhold, 273 Ark. 33, 616 S.W.2d 720 (Sup.Ct. 1981) (grain cart); California  Grimshaw v. Ford Motor Co., 119 Cal. App.3d 757, 174 Cal. Rptr. 348 (Ct.App. 1981) (automobile fuel system); Delaware  Cloroben Chem. Corp. v. Comegys, 464 A.2d 887 (Sup.Ct.Del. 1983) (sulfuric acid drain cleaner); Florida  Piper Aircraft Corp. v. Coulter, 426 So.2d 1108 (Dist.Ct.App.Fla. 1983) (aircraft part); Hawaii  Vollert v. Summa Corp., 389 F. Supp. 1348 (D.Hawaii 1975) (helicopter part); Illinois  Froud v. Celotex Corp., 107 Ill. App.3d 654, 63 Ill.Dec. 261, 437 N.E.2d 910 (App.Ct. 1982) (asbestos); Indiana  Gorman v. Saf-T-Mate, Inc., 513 F. Supp. 1028 (N.D.Ind. 1981) (motor boat); Minnesota  Gryc v. Dayton-Hudson Corp., 297 N.W.2d 727 (Sup.Ct.Minn. 1980), cert. den. sub nom. Riegel Textile Corp. v. Gryc, 449 U.S. 921, 101 S.Ct. 320, 66 L.Ed.2d 149 (1980) (flammable child's pajamas); Missouri  Rinker v. Ford Motor Co., 567 S.W.2d 655 (Mo. Ct. App. 1978) (idle cam); New York  Baleno by Baleno v. Jacuzzi Research, Inc., 93 A.D.2d 982, 461 N.Y.S.2d 659 (App. Div. 1983) (hydrotherapy unit); Ohio  Moran v. Johns-Manville Sales Corp., 691 F.2d 811 (6th Cir.1982) (asbestos), and Leichtamer v. American Motors Corp., 67 Ohio St.2d 456, 424 N.E.2d 568 (Sup.Ct. 1981) (roll bar on jeep); Oklahoma  Thiry v. Armstrong World Industries, 661 P.2d 515 (Okl.Sup.Ct. 1983) (asbestos); Oregon  State ex rel. Young v. Crookham, 290 Or. 61, 618 P.2d 1268 (Sup.Ct. 1980); Pennsylvania  Neal v. Carey Canadian Mines, Ltd., 548 F. Supp. 357 (E.D.Pa. 1982) (asbestos), and Hoffman v. Sterling Drug, Inc., 485 F.2d 132 (3d Cir.1973) (prescription drug); South Carolina  Campus Sweater & Sportswear v. M.B. Kahn Const., 515 F. Supp. 64 (D.S.C. 1979), aff'd per curiam *123 644 F.2d 877 (4th Cir.1981) (roofing material); Tennessee  Johnson v. Husky Industries, Inc., 536 F.2d 645 (6th Cir.1976) (charcoal grill); Texas  Rawlings Sporting Goods Co., Inc. v. Daniels, 619 S.W.2d 435 (Tex.Civ.App. 1981) (football helmet); Wisconsin  Wangen v. Ford Motor Co., 97 Wis.2d 260, 294 N.W.2d 437 (Sup.Ct. 1980) (fuel tank); Virgin Islands  Acosta v. Honda Motor Co., Ltd., 717 F.2d 828 (3d Cir.1983) (motorcycle). See also, Annot., "Allowance of Punitive Damages in Products Liability Cases," 13 A.L.R.4th 52 (1982). The only jurisdiction in which the issue was raised but not decided affirmatively is Maryland, which expressly declined to address the question at all since negligence as well as strict liability had been pleaded. See American Laundry Machinery v. Horan, 45 Md. App. 97, 412 A.2d 407 (Ct.Sp.App. 1980). It is instructive to note that the Hawaii, Indiana, Missouri, Pennsylvania, South Carolina, Tennessee and Virgin Islands cases all reflect the prediction by federal courts in diversity actions that the state whose law governed and which had not yet itself addressed the issues would permit punitive damages in products liability actions. It is also instructive to note that Judge Friendly's reservations respecting the allowability of punitive damages were not accepted by that jurisdiction, see Baleno by Baleno v. Jacuzzi Research, Inc., supra, and that the District Court correctly predicted that Florida would allow such damages. See Dorsey v. Honda Motor Co., Ltd., 655 F.2d 650 (5th Cir.1981), modified on other grounds, 670 F.2d 21 (5th Cir.1982), cert. den. 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1983), presaging Piper Aircraft Corp. v. Coulter, supra.
The only dissenting view has been expressed by the United States District Court for the District of New Jersey, which recently predicted that the New Jersey Supreme Court, if called upon to decide the issue, would do so negatively. See Gold v. Johns-Manville Sales Corp., 553 F. Supp. 482 (D.N.J. 1982), followed by Wolf by Wolf v. Proctor & Gamble Co., 555 F. Supp. 613 (D.N.J. 1982). But see, contra, Cinnaminson Tp. Bd. of Educ. v. U.S. Gypsum Co., 552 F. Supp. 855 (D.N.J. 1982). Defendants here place considerable reliance on Gold. For the reasons hereafter *124 set forth, we are satisfied that the reasoning of Gold is unpersuasive and that its prediction is erroneous. The New Jersey Supreme Court has been in the vanguard of the development of a responsive and progressive products liability law since Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358 (1960). For the last two decades it has led the country in its ideological commitment to the protection of consumers and the concomitant consequence of inducing those who place products into the stream of commerce to act with social responsibility. See, e.g., Cintrone v. Hertz Truck Leasing, etc., 45 N.J. 434 (1965); Sabloff v. Yamaha Motor Co., Ltd., 59 N.J. 365 (1971); Cepeda v. Cumberland Engineering Company, Inc., 76 N.J. 152 (1978); Suter v. San Angelo Foundry & Machine Company, 81 N.J. 150 (1979); Freund v. Cellofilm Properties, Inc., 87 N.J. 229 (1981); Beshada v. Johns-Manville Products, 90 N.J. 191 (1982). We are convinced that it would not raise a dissenting voice on this issue.
The conceptual basis of the Gold view, strenuously endorsed by defendants, is the notion that punitive damages are logically inconsistent with a cause of action in strict liability since punitive damages are wholly conduct-oriented and strict liability in the products liability area is wholly product-oriented. It is certainly true, as defendants contend, that the Supreme Court in Beshada reaffirmed the principle that "strict liability focuses on the product, not the fault of the manufacturer." Beshada, 90 N.J. at 204. As we understand the point of Beshada, however, and indeed of the whole strict liability doctrine, the focus on the product rather than on the manufacturer's conduct is simply intended to relieve the plaintiff of the obligation to prove the manufacturer's fault. The inquiry is not how or why, in terms of culpability, a product is defective, but only whether or not it is in fact defective, either because of a design flaw, a manufacturing flaw or, as in Beshada, the failure of a duty to warn. In our view, there is no logical and rational imperative supporting defendants' corollary proposition that relieving a plaintiff from the obligation to prove fault necessarily precludes him from so doing in an egregious case. We are in full agreement with the *125 observation of the court in Neal v. Carey Canadian Mines, Ltd., supra, 548 F. Supp. at 378, that
... there is no theoretical problem in a jury finding that a defendant is liable because of the defectiveness of a product and then judging the conduct of the defendant in order to determine whether punitive damages should be awarded on the basis of "outrageous conduct" in light of the injuries sustained by the plaintiff * * * By dispensing with the need to prove fault for purposes of establishing liability under section 402A [2 Restatement 2d, Torts (1965)] the law of strict liability does not preclude consideration of "aggravated fault," if the plaintiffs can properly meet their burden of demonstrating sufficient evidence of the defendant's outrageous conduct.
See also Acosta v. Honda Motor Co., Ltd., supra, 717 F.2d at 833; Piper Aircraft Corp. v. Coulter, supra, 426 So.2d at 1109; Wangen v. Ford Motor Co., supra, 904 N.W.2d at 443.
With respect to the public policy considerations implicated in allowing punitive damages in products liability cases, we concur with the judicial consensus that if punitive damages are awarded only in egregious situations, the public interest, on balance, is better served by allowing such an award than by precluding it. As we have noted, the underlying purpose of punitive damages is both to punish the offender and to deter him and others from engaging in similar conduct. Both punishment and deterrence are appropriate responses to a supplier of defective goods who has knowledge of the high degree of risk of grave harm to which they will subject the public but who nevertheless makes the cynical, conscious business decision to place and keep them on the market. Were punitive damages to be withheld, those entrepreneurs who act with flagrant disregard of the public safety would be able to write off the public's injury as a cost of doing business by the payment of compensatory damages, for which there is typically insurance coverage. One court has described this practice as the "coldblooded calculation" that it is more profitable to pay claims than to cure the defect. See Campus Sweater & Sportswear v. M.B. Kahn Const., supra, 515 F. Supp. at 106-107. Thus, it is only the threat of punitive damages which can ultimately induce these entrepreneurs and others to act with a reasonable modicum of responsibility. We therefore agree with the perception of the California court that:

*126 In the traditional noncommercial intentional tort, compensatory damages alone may serve as an effective deterrent against future wrongful conduct but in commerce related torts, the manufacturer may find it more profitable to treat compensatory damages as part of the cost of doing business rather than to remedy the defect.... Governmental safety standards and the criminal law have failed to provide adequate consumer protection against the manufacture and distribution of defective products ... Punitive damages thus remain as the most effective remedy for consumer protection against defectively designed mass produced articles. They provide a motive for private individuals to enforce rules of law and enable them to recoup the expenses of doing so which can be considerable and not otherwise recoverable. [Grimshaw v. Ford Motor Co., supra, 174 Cal. Rptr. at 382-383]
The Minnesota court, quoting from the Owen article, justified the allowance of punitive damages on the basis of these public policy considerations:
Most manufacturers, both from a desire to avoid liability and from a generalized sense of social responsibility prudently use their resources to prevent excessively hazardous products from reaching or staying on the market. On occasion, however, manufacturers abuse their control over safety information and market defective products in flagrant disregard of the public safety. * * * A legal tool is needed that will help to expose this type of gross misconduct, punish those manufacturers guilty of such flagrant misbehavior, and deter all manufacturers from acting with similar disregard for the public welfare. The punitive damage remedy is such a tool. [Gryc v. Dayton-Hudson Corp., supra, 297 N.W.2d at 733]
And where the defect is a failure to give appropriate warnings to users when the product is unavoidably hazardous, the Oklahoma court, in an asbestos case, noted that:
It is not only the expense in affording the warning but the anticipation that consumers would be afraid to purchase the product that motivates manufacturers to choose to absorb ensuing injury claims. [Thiry v. Armstrong World Industries, supra, 661 P.2d at 517.]
And see, expressing similar views, Sturm, Ruger & Co., Inc. v. Day, supra, 594 P.2d at 47; Forrest City Mach. Works, Inc. v. Aderhold, supra, 616 S.W.2d at 726; Froud v. Celotex Corp., supra, 63 Ill.Dec. at 261, 437 N.E.2d at 910; Boddie v. Litton Unit Handling Systems, 118 Ill. App.3d 520, 74 Ill.Dec. 112, 122, 455 N.E.2d 142, 152 (App. 1983); Neal v. Carey Canadian Mines, Ltd., supra, 548 F. Supp. at 376-377; Rawlings Sporting Goods Co., Inc. v. Daniels, supra, 619 S.W.2d at 441; Wangen v. Ford Motor Co., supra, 294 N.W.2d at 451; Acosta v. Honda Motor Co., Inc., supra, 717 F.2d at 837.
*127 Relying on Judge Friendly's expression of concern in Roginsky, supra, defendants urge that these justifications for punitive damages are outweighed by the potentially catastrophic impact which they would have on manufacturers who are faced with mass litigation. While the courts have not been insensitive to such arguments, all who have considered the issue, with the exception of the United States District Court in Gold, have been persuaded, as are we, that the public interest involved is nevertheless sufficiently compelling to demand the ultimate protection which punitive damages afford.
Thus, as recently summed up by the Oregon court, although "[c]onsiderable concern has surfaced in recent decades over the effect of multiple punitive damages awards on a single defendant faced with mass litigation," nevertheless the "financial interests of a wanton wrongdoer must be considered in the context of societal concern for the injured and the future protection of society." State ex rel. Young v. Crookham, supra, 618 P.2d at 1270. And as the Illinois court concluded in Froud v. Celotex Corp., supra, 63 Ill.Dec. at 264, 437 N.E.2d at 913, an asbestos case:
[D]efendants' brief contains a broad-based attack on the propriety of punitive damage awards in the context of mass tort litigation, such as the large number of asbestos cases which have been filed across the nation. It is feared that, in such mass tort cases, the possibility that each plaintiff could separately recover a substantial award of punitive damages might bankrupt even the richest defendants. The defendants therefore argue that public policy should prohibit punitive damages in mass tort cases. But we do not believe that defendants should be relieved of liability for punitive damages merely because, through outrageous misconduct, they may have managed to seriously injure a large number of persons. Such a rule would encourage wrongdoers to continue their misconduct because, if they kept it up long enough to injure a large number of people, they could escape all liability for punitive damages. [Emphasis the court's.]
See also Grimshaw v. Ford Motor Co., supra, 174 Cal. Rptr. at 383-384; Vollert v. Summa Corp., supra, 389 F. Supp. at 1350-1351; Gryc v. Dayton-Hudson Corp., supra, 297 N.W.2d at 740; Rinker v. Ford Motor Co., supra, 567 S.W.2d at 667; Moran v. Johns-Manville Sales Corp., supra, 691 F.2d at 816; Campus Sweater & Sportswear v. M.B. Kahn Const., supra, 515 *128 F. Supp. at 103; Wangen v. Ford Motor Co., supra, 294 N.W.2d at 454-456, 461; Acosta v. Honda Motor Co., Inc., supra, 717 F.2d at 837-839.
We also agree with the view of these cases that the prediction of wholesale insolvency caused by punitive awards is much exaggerated. With respect to Johns-Manville, it is clear that its present insolvency proceedings are primarily attributable to its exposure to compensatory rather than punitive damages. As noted in In re Johns-Manville Corp., 26 B.R. 420, 422 (Bkrtcy. S.D.N.Y. 1983), Johns-Manville is a defendant or co-defendant in more than 11,000 asbestos related suits brought in 46 states and expects a possibility of up to 32,000 additional suits in the next 26 years. "Since 1981, Manville has been found liable for punitive damages in several asbestos lawsuits and anticipates additional punitive damages awards which would greatly increase its potential liabilities. According to a study commissioned by Manville, its potential liability will not be less than $2 billion over the next twenty years. Manville represents that these enormous actual and potential liabilities constitute the principal reason for its Chapter 11 filing." Ibid. While we appreciate that two billion dollars payable over a 20-year period is a staggering sum, we also note that Johns-Manville is a giant business concern with a long history of immense profitability which at least in some part was achieved, and unnecessarily so, at the expense of the health of thousands of asbestos workers.[2]
We concur, moreover, with the judicial consensus that the legitimate interests of product-liability defendants can be served by careful judicial scrutiny of the adequacy of plaintiffs' proofs *129 regarding outrageous conduct, by monitoring excessive punitive damage awards, and by allowing the introduction into evidence of all pertinent financial circumstances of the defendant, including its contingent liabilities.[3]
Other objections advanced by these defendants have also been considered and rejected by other courts. Thus, in response to the argument that punitive damages would not punish those who were actually culpable persons but only innocent stockholders, the Wisconsin court observed that "* * * the loss of investment and the decline in value of investments are risks which investors knowingly undertake and investors should not enjoy ill-gotten gains." See Wangen v. Ford Motor Co., supra, 294 N.W.2d at 453, further noting that there is an important public interest served by encouraging stockholders to exercise closer control and scrutiny over corporate operations. In response to the further argument that punitive damages are inappropriate when the culpable individuals have already left management and the corporate practices have been reformed, the court in Moran v. Johns-Manville Sales Corp., supra, 691 F.2d at 816, simply pointed out that that contention ignores the concept of the responsible legal and juridical person, namely, the corporation itself.
*130 Finally, we are constrained to point out the anomaly of the public policy arguments against the allowance of punitive damages in strict liability cases in view of the fact that punitive damages are concededly and routinely allowable in appropriate cases when manufacturer negligence is pleaded and proved. Thus, the District Court in Gold, despite its prediction that New Jersey would not permit punitive damages in strict liability cases, nevertheless refused to strike the punitive damages claim because negligence was an additional theory of suit. Evidently then the net result of the Gold approach would simply be to place the unproductive burden upon a plaintiff to plead and prove negligence as well as strict liability. It is unproductive because, whether or not negligence is pleaded and proved as a separate cause of action, a plaintiff who seeks punitive damages is in any event obliged to prove not only culpable conduct but egregious culpable conduct.
We note further the view expressed in Gold that allowing punitive damages in strict liability actions might increase the consumer's costs for the product and encourage producers to eschew not only their own product research but also that of others in order to avoid being charged with knowledge of defects. But whatever force these public policy arguments might have is in any case not subject to diminution by the fact that plaintiff sues in negligence rather than in strict liability. The economic impact of punitive damages on the defendant and the consuming public would be the same irrespective of the precise cause of action underlying an injured plaintiff's compensatory recovery. Thus, either punitive damages should be permitted against grossly irresponsible manufacturers or they should not be. We join the virtually unanimous view that they should be.
Having determined that punitive damages are allowable, we address the contention of each of the defendants that there was insufficient proof of such egregious conduct to support the imposition of punitive damages in this case. We have no doubt, *131 however, that plaintiffs' proofs justified the jury's evident conclusion that irrespective of whatever remedial efforts may have been taken by the asbestos industry years later, both defendants, during the period of plaintiff's exposure, acted knowingly and deliberately in subjecting him as an asbestos worker to serious health hazards with utter and reckless disregard of his safety and well-being. It is indeed appalling to us that Johns-Manville had so much information on the hazards to asbestos workers as early as the mid-1930's and that it not only failed to use that information to protect these workers but, more egregiously, that it also attempted to withhold this information from the public. It is also clear that even though Johns-Manville may have taken some remedial steps decades ago to protect its own employees, it apparently did nothing to warn and protect those who, like plaintiff, were employed by Johns-Manville customers engaged in the manufacture and fabrication of asbestos products.
As to Bell, it is its assertion that the proofs respecting Johns-Manville's conduct were improperly imputed to it by the jury and that the admission it made was by itself insufficient to charge it with conduct egregious enough to justify imposition of punitive damages. We disagree. There was no direct proof that Bell was a participant in the conspiracy to suppress information to which others may have been a party. Nevertheless, it did admit its failure to warn and it did admit it had the same knowledge which was available to the Canadian asbestos industry as a whole in the 1930's respecting the health hazards of prolonged exposure. Johns-Manville was the leader of the Canadian asbestos industry. We are therefore of the view that the jury could properly have inferred that the scope and content of Bell's knowledge were the same as Johns-Manville's and, consequently, that it acted with similar conscious and flagrant disregard of the safety and health of others. We are satisfied that that conduct met the standard of egregiousness which must underlie a punitive damages award. See also Neal v. Carey Canadian Mines, Ltd., supra, 548 F. Supp. at 376; Thiry v. *132 Armstrong World Industries, supra, 661 P.2d at 516; Moran v. Johns-Manville Sales Corp., supra, 691 F.2d at 814-816. And see In re Related Asbestos Cases, 543 F. Supp. 1152 (N.D.Cal. 1982); Froud v. Celotex, supra. We further note that in cases dealing with products other than asbestos, it has been uniformly concluded that punitive damages will lie when a manufacturer has knowledge, whether or not suppressed, that his product poses a grave risk to the health or safety of its users and fails to take any protective or remedial action. See, e.g., Leichtamer v. American Corp., supra, 424 N.E.2d at 578-579; Sturm, Ruger & Co., Inc. v. Day, supra, 594 P.2d at 46-47; Grimshaw v. Ford Motor Co., supra, 174 Cal. Rptr. at 375; Rinker v. Ford Motor Co., supra, 567 S.W.2d at 668; Rawlings Sporting Goods Co., Inc. v. Daniels, supra, 619 S.W.2d at 441. The jury here was justified in concluding that both defendants, fully appreciating the nature, extent and gravity of the risk, nevertheless made a conscious and coldblooded business decision, in utter and flagrant disregard of the rights of others, to take no protective or remedial action.
Finally, Bell raises several objections to the compensatory damage award. It argues first that asbestos is not a product within the intendment of 2 Restatement 2d, Torts, § 402A (1965). It is clear, however, that asbestos suppliers do process and package the material and are reasonably regarded as its producers. See, expressly rejecting a similar contention, Neal v. Carey Canadian Mines, Ltd., supra, 548 F. Supp. at 372, which held that "asbestos fiber which is extracted through the crushing of the asbestos rock and then compacted into bags is a product within the definition of § 402A." Bell also challenges two evidence rulings. One admitted evidence refreshing plaintiff's recollection of his 1945 period of employment by Asbestos, Ltd. The other refused to strike testimony of plaintiff's physician that plaintiff must live with the possibility of an increased risk of cancer. Our review of the record satisfies us that neither ruling was incorrect. See R. 2:11-3(e)(1)(E).
The judgment appealed from is affirmed in its entirety.
NOTES
[1] For convenience, the identification "Johns-Manville" is used to denote all of the Johns-Manville defendants who include Johns-Manville Corporation; Johns-Manville Sales Corporation, successor to Johns-Manville Products Corporation; Johns-Manville Canada, Inc., formerly known as Canadian Johns-Manville Co., Ltd.; and Johns-Manville Amiante Canada, Inc., formerly known as Canadian Johns-Manville Asbestos, Ltd.
[2] We also note the remedial suggestion of some courts that defendants who are faced with mass products liability litigation might resort to a class action against potential claimants to determine the appropriateness of punitive damages and, if imposed, to fix a single punitive damages fund for all claimants. See In re Northern Dist. of Calif. "Dalkon Shield" I.U.D. Products Liability Litigation, 526 F. Supp. 887 (N.D.Cal. 1981), vacated and remanded, 693 F.2d 847 (9th Cir.1982), cert. den. 459 U.S. 1171, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983). And see Froud v. Celotex Corp., supra, 63 Ill.Dec. at 264, 437 N.E.2d at 913.
[3] In terms of judicial control over punitive damage awards in product liability cases, we note the observation in Wangen v. Ford Motor Co., supra, 294 N.W.2d at 460, that the jury should be instructed to consider the following factors:

"[t]he seriousness of the hazard to the public; the profitability of the misconduct, the attitude and conduct on discovery of the misconduct; the degree of the manufacturer's awareness of the hazard and of its excessiveness; the employees involved in causing or concealing the misconduct; the duration of both the improper behavior and its concealment; the financial condition of the manufacturer and the probable effect thereon of a particular judgment; and the total punishment the manufacturer will probably receive from other sources."
A defendant wishing to rely on its contingent liabilities in mitigation of punitive damages might consider requesting a bifurcated trial on that issue immediately to follow the compensatory damages verdict and to be tried by the same jury.