Theodore P. GOGOL and Madeline Gogol, his wife, Plaintiffs,

v.

JOHNS–MANVILLE SALES CORPORA-TION, Successor to Johns-Manville Products Corporation; Johns-Manville Canada, Inc., formerly known as Canadian Johns-Manville Company, Ltd.; Carey Canadian Mines, Ltd., Subsidiary of Panacon Corporation; Owens Illinois, Inc.; Keene Corporation; Keene Building Products Corporation; Raybestos-Manhattan, Inc.; the Celotex Corporation, Successor in interest to Philip Carey Manufacturing Co., Philip Carey Corp., Briggs Manufacturing Co., and Panacon Corp.; Owens Corning Fiberglas Corporation; and John Doe; Fred Doe; James Doe; Joseph Doe; Tom Doe; Harry Doe; Robert Doe; Ken Doe; Daniel Doe; Michael Doe; Larry Doe; Ben Doe; and Bill Doe; and Pittsburgh Corning Corp., as successor in interest to Unarco Industries, Inc., Defendants.

Robert J. SEMPLE and Evangeline Semple, his wife, Plaintiffs,

v.

JOHNS–MANVILLE SALES CORPORA-TION, Successor to Johns-Manville Products Corporation; Nicolet Industries; Keene Corporation; Keene Building Products Corporation; Raybestos-Manhattan, Inc.; the Celotex Corporation, Successor in interest to Philip Carey Manufacturing Co., Philip Carey Corp., Briggs Manufacturing Co., and Panacon Corp.; Armstrong Cork Company; and John Doe; Fred Doe; James Doe; Joseph Doe; Tom Doe; Harry Doe; Robert Doe; Ken Doe; Daniel Doe; Michael Doe; Larry Doe; Ben Doe; and Bill Doe; and Pittsburgh Corning Corp., as successor in interest to Unarco Industries Corp., Defendants.

Civ. A. Nos. 81–1501, 81–1790.

United States District Court, D. New Jersey.

Oct. 16, 1984.

Ergood & Gavin, P.A., Westmont, N.J., for plaintiffs Theodore P. Gogol and Madeline Gogol, his wife; and Robert J. Semple and Evangeline Semple, his wife.

Budd, Larner, Kent, Gross, Picillo & Rosenbaum, Newark, N.J., for defendant Johns-Manville Sales Corp.

McCarter & English, Newark, N.J., for defendant Owens-Illinois, Inc.

Lowenstein, Sandler, Brochin, Kohl, Fisher & Boylan, Roseland, N.J., for Keene Corp. and Keene Bldg. Products Corp.

Morgan, Melhuish, Monaghan & Spielvogel, Livingston, N.J., for Raybestos-Manhattan, Inc.

Tuso, Gruccio, Pepper, Buonadonna, Giovinazzi & Butler, P.A., Vineland, N.J., for Celotex Corp.

Horn, Kaplan, Goldberg & Gorny, Atlantic City, N.J., for Owens Corning Fiberglas Corp.

Henry R. Simon, Newark, N.J., for Pittsburgh Corning Corp.

Horuvitz, Perlow & Morris, Bridgeton, N.J., for Nicolet Industries.

Steedle, Megargee, Youngblood, Franklin & Corcoran, Pleasantville, N.J., for Armstrong Cork Co.

GERRY, District Judge.

These are two asbestos cases which the court is treating together because the issues are identical. The plaintiffs allege that they contracted the disease of asbestosis as a proximate result of exposure to asbestos-containing products supplied by, among others, defendant Pittsburgh Corning, to the plaintiffs' employer.

According to the certification of plaintiffs' counsel, plaintiffs were shipyard workers who worked in close proximity to an asbestos-containing product manufactured by Pittsburgh Corning. Plaintiffs allege that Pittsburgh Corning was negligent in failing to warn of known dangers associated with exposure to asbestos, and that Pittsburgh Corning sold a defective product (strict liability) because it did not contain proper warnings. Relevant to these causes of action is the question of what Pittsburgh Corning knew about the dangers of asbestos.

The plaintiffs would like to introduce into evidence the deposition testimony of Richard Gaze, an officer of Cape Industries, a company which supplied raw asbestos fiber to Pittsburgh Corning. This deposition was taken in connection with two federal cases in Texas in which Pittsburgh Corning was a defendant. The deposition sets forth communications Mr. Gaze had with representatives of Pittsburgh Corning regarding the dangers of asbestos. The certification states that Gaze is unavailable to testify since he is beyond the territorial jurisdiction of the United States. Further, it is stated that Pittsburgh Corning was represented by counsel at the Gaze deposition and had an opportunity to cross-examine the witness and would have had an identical motive in cross-examining Gaze in the Texas cases as would be present in this case. The motion for admission of this testimony against Pittsburgh Corning only is based on Evidence Rule 804(b)(1).

The plaintiffs are also moving to strike the state of the art defense raised by all defendants, claiming that as to the *strict liability/failure to warn* counts of the complaint, this defense is unavailable under New Jersey law. Further, defendant Raybestos-Manhattan, Inc. (Raymark) is moving for summary judgment on the issue of punitive damages.

1. Rule 804(b)(1) provides:

The following [is] not excluded by the hearsay rule if the declarant is unavailable as a witness:

Testimony given as a witness ... in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.

"Unavailability" is defined to cover a situation where the declarant cannot be pro-

cured by process or other reasonable means.

■ The deposition testimony in question fits all the requirements of Rule 804: the declarant is unavailable, the testimony was given at a deposition, and Pittsburgh Corning, according to plaintiffs' counsel, was present and had the opportunity and motive to develop the testimony (regarding knowledge of dangers).

Therefore, the testimony fits within the Rule 804 hearsay exception and may be admitted against Pittsburgh Corning. The court must here emphasize that our ruling is limited to the issue of admissibility under Rule 804. The defendant, Pittsburgh Corning, remains free at the time of trial to object to the testimony on other grounds. The court has not, in deciding this motion, expressed any opinion, for example, regarding the relevance or probativeness of the proffered testimony.

The motion will be granted.

2. The plaintiffs next move to strike the defendants' state of the art defense in connection with the strict liability count of the complaint. The strict liability count charges that the defendants' products were defective "for want of proper, sufficient, and adequate notice, warnings, instructions and packaging." The plaintiffs, according to the certification of counsel, will stipulate that their cause of action under the strict liability count is limited to the allegation of failure to warn. The certification states that the state of the art defense has been raised by all defendants as to all of plaintiffs' claims, strict liability included. It is argued that this defense is unavailable in New Jersey in strict liability/failure to warn cases.

As it relates to warning cases, the state-of-the-art defense asserts that distributors of products can be held liable only for injuries resulting from dangers that were scientifically discoverable at the time the product was distributed.

*Beshada v. Johns-Manville,* 90 N.J. 191, 202, 447 A.2d 539 (1982). The *Beshada*

court expressly rejected the state of the art defense in warning cases:

> Essentially, state-of-the-art is a negligence defense. It seeks to explain why defendants are not culpable for failing to provide a warning.... But in strict liability cases, culpability is irrelevant. The product was unsafe. That it was unsafe because of the state of technology does not change the fact that it was unsafe. Strict liability focuses on the product, not the fault of the manufacturer.

*Id.* at 204, 447 A.2d 539. Knowledge of the dangers of the product is imputed to defendants as a matter of law. *Id.* at 203, 447 A.2d 539.

On the basis of *Beshada,* the plaintiff here quite correctly moved to strike the state of the art defense.

On July 30, 1984, the New Jersey Supreme Court decided *Feldman v. Lederle Laboratories,* 97 N.J. 429, 479 A.2d 374 (1984). That case throws the vitality of *Beshada* into considerable doubt. *Feldman,* after holding that strict liability is applicable to manufacturers of prescription drugs, went on to again consider the state of the art defense in warning cases. *Feldman* states:

> When the strict liability defect consists of an improper ... warning, *reasonableness of the defendant's conduct* is a factor in determining liability.... Generally, ... available knowledge in defect warning situations [is a] relevant factor in measuring reasonableness of conduct. Generally, conduct should be measured by knowledge *at the time the manufacturer distributed the product.* Did the defendant know, or should he have known, of the danger, given the scientific, technological, and other information available when the product was distributed; or, in other words, did he have actual or constructive knowledge of the danger.

The court further stated that:

> A warning that a product may have an unknowable danger warns one of nothing.

Thus, *Feldman* seems to resuscitate the state of the art defense in warning cases.

The manufacturer will no longer be held, as a matter of law, to know the unknowable. To be sure, *Feldman* places a heavy burden on the manufacturer of demonstrating that a danger was unknowable. The manufacturer is held to the standard of an expert in the field and is required to keep abreast of scientific advances. Still, these are factual issues, and, legally, it seems that state of the art is now a valid defense.

The *Feldman* court's treatment of *Beshada* is somewhat cryptic. The court states:

If *Beshada* were deemed to hold generally or in all cases ... that in a warning context knowledge of the unknowable is irrelevant in determining the applicability of strict liability, we would not agree. The rationale of *Beshada* is not applicable to this case. We do not overrule *Beshada*, but restrict *Beshada* to the circumstances giving rise to its holding.

Significantly, *Beshada* was an asbestos case. Moreover, *Beshada* is not a case limited to plaintiffs who worked with asbestos in its rawest, least refined form. At least some of the plaintiffs in *Beshada*, *like the plaintiffs here*, used asbestos products or materials in the course of their work, or worked with and around insulation products containing asbestos.

■ Thus, since the *Feldman* court states that *Beshada* is restricted to the circumstances giving use to its holding, this court believes that in ruling on these plaintiffs' motion, it must still follow *Beshada*, *not* the modification announced in *Feldman*. For the circumstances giving rise to the holding in *Beshada* are the circumstances present here. The import of *Feldman*, therefore, is that one rule applies to asbestos products, and a different rule applies to non-asbestos products. Although the New Jersey Supreme Court did not explicitly draw this distinction, this court believes it to necessarily be drawn by the language of *Feldman*.

The defendants argue that this distinction is unconstitutional in that it denies equal protection to asbestos product manufacturers who are singled out for special disfavored treatment compared with manufacturers of non-asbestos products. The defendants cite the case of *Suchit v. Baxt*, 176 N.J.Super. 407, 423 A.2d 670 (Law Div. 1980), a case which *upheld*, on equal protection grounds, certain court rules which treated medical malpractice tort claimants differently from non-medical malpractice tort claimants.

This court, conscious of its rather "passive" role as a court sitting in diversity, is hesitant to even address this issue. We are bound to follow the pronouncements of the New Jersey Supreme Court, and we are confident that that distinguished court is no more disposed to set up unconstitutional classifications than this court. We presume that the New Jersey Supreme Court was aware of the constitutional issues posed by *Feldman* and found them not to be problematic. Like the actions of other branches of government, those of the Supreme Court are presumed constitutional.

We therefore will address the defendants' argument only cursorily. We start with the unassailable proposition that:

in the areas of economics and social welfare [such as we are presented with here], a state does not violate the equal protection clause ... if the classification has some "reasonable basis" [even if] in practice it results in some inequality.

*Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970), *cited in Suchit, supra*. Here, then, the distinction made by *Feldman* need merely be rationally related to some legitimate end the Supreme Court desires to see achieved.

Looking generally at tort law, this court recognizes numerous distinctions made between classes of litigants. Under the New Jersey Tort Claims Act, for example, governmental entities and officers are at a distinct advantage over private actors. Non-medical-malpractice plaintiffs, as we have just learned, are somewhat more favorably treated by New Jersey courts than malpractice claimants. The whole workmen's compensation scheme places both employers and employees in a position dif-

ferent from those involved in non-job-related accidents. There is nothing unconstitutional about any of the above examples. All of them are the result of legitimate policy decisions of New Jersey (and other states).

Looking at tort law generally, there is a huge distinction made between those defendants subjected to strict liability and those against whom plaintiffs are only entitled to prove negligence. Again, the courts have acted on the basis of public policy. Indeed, *Feldman* itself is basically a case dealing with the reasons to subject or not subject drug manufacturers to strict liability. Clearly, the chasm between strict liability defendants who may advance a state of the art defense and those who may not is not nearly so wide as the chasm between defendants subjected to strict liability and those who are not.

It needs hardly be stated that asbestos cases are like no other products liability cases in terms of their volume and difficulty, as well as the massive societal problem they manifest. This alone, we believe, warrants the distinction made by the *Feldman* court. And other reasons can surely be generated for disparate treatment, which, we trust, the New Jersey Supreme Court will elucidate when called upon to do so.

We return to the presumption of constitutional validity. Here, other than making a bald assertion that the classification at issue is infirm, the defendants have told us nothing. Under that circumstance, as well as based on all we have stated earlier, we decline to declare *Feldman's* distinction unconstitutional.

Therefore, plaintiffs' motion will be granted.

3. The defendant Raymark asks for a ruling barring the plaintiffs' claim for punitive damages. The plaintiffs are asking for punitive damages on both their negligence and strict liability/failure to warn causes of action.

The defendant advances a number of arguments as to why such damages should not be allowed:

1. As a matter of policy, punitive damages should not be awarded where a defendant is faced with multiple punitive damages claims for the same conduct.
2. Punitive damages are unconstitutional in a civil action.

In the alternative, the defendant argues that if the court refuses to throw out the punitive damage claim, it should sever the trial of that issue from the trial of the compensatory damage issue.

As to public policy, the defendant argues that the punishment and deterrent purposes of punitive damages are adequately served by its having to defend over 14,000 asbestos suits nationwide and pay out compensatory awards potentially in the billions of dollars. There are other arguments that the awarding of punitive damages in the first-tried round of asbestos cases will make it less likely that the defendant will be financially able to pay out compensatory damages to plaintiffs whose cases go to trial later. Then there is an argument that strict liability—with emphasis on the product—and punitive damages—with emphasis on the conduct—are incompatible. Finally, it is said, because the conduct occurred so many years ago, an award would punish actors who are themselves blameless.

In passing upon these arguments, we are conscious of our role as a court sitting in diversity: we are not free to accept these arguments unless the New Jersey Supreme Court has accepted them; and if the New Jersey Supreme Court has not addressed these arguments, we must attempt to predict its disposition.

Significantly, Judge Ackerman, in *Gold v. Johns-Manville*, 553 F.Supp. 482 (D.N.J. 1982), and Judge Fisher, following *Gold*, in *Wolf v. Procter & Gamble*, 555 F.Supp. 613 (D.N.J.1982), have predicted that the New Jersey Supreme Court would *not* permit punitive damages in the strict liability context. *But see Cinnaminson Township v. U.S. Gypsum*, 552 F.Supp. 855 (D.N.J.1982 —Thompson) (*contra*). These courts reasoned that under the New Jersey Supreme Court's decision in *Beshada v. Johns-Manville*, 90 N.J. 191, 447 A.2d 539 (1982),

punitive damages, with their emphasis on conduct, are not compatible with the product-orientation inherent in strict liability. Importantly, the *Gold* court refused to extend its holding to include asbestos negligence claims. Thus, under *Gold,* where a plaintiff sues under both theories, he may still be entitled to punitive damages on the negligence theory. Here, of course, the plaintiffs are suing on both theories.

■ Because of a New Jersey court decision which deals with strict liability and punitive damages, a decision issued more recently than the decisions of the federal courts, we reach a different result than the *Gold* and *Wolf* courts. We agree with the views most recently expressed by the New Jersey Appellate Division in *Fischer v. Johns-Manville,* 193 N.J.Super. 113, 472 A.2d 577 (App.Div.1984, per J. Pressler). The *Fischer* court persuasively explained that *Beshada* merely *relieves* the plaintiff of the obligation of proving fault. It does not *preclude* the plaintiff from doing so in an egregious case.

We further concur with the *Fischer* court's rejection of the other policy grounds advanced by the defendant here. The contention that the presently constituted corporation should not be punished for the acts of the prior corporate principals ignores the concept of the corporation as a legal entity. *See also Moran v. Johns-Manville,* 691 F.2d 811 (6th Cir.1982). The argument regarding the effect of mass litigation has a certain validity, but we are not comfortable accepting it, again for the reasons persuasively advanced in *Fischer.*

4. *Constitutionality.* The defendant argues that punitive damages are *de facto* a criminal sanction, and that it would be unconstitutional to subject defendant to this sanction without affording defendant the procedural safeguards present in criminal cases; e.g., the heightened burden of proof, the protection against double jeopardy, etc.

■ The court, in the face of centuries of punitive damages litigation, is at a loss as to how to address this contention. The defendant does not cite a single case on which the court might rely in reaching such a radical conclusion. Accordingly, we will reject the defendant's conclusory argument that punitive damage claims constitute a criminal action. (The *Kennedy v. Mendoza-Martinez* case, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963) on which defendant relies is so clearly irrelevant that it does not warrant discussion.)

5. *Severance.* This motion will also be denied. It appears that, at least as to his negligence claim, the plaintiff will have to show knowledge of danger (via the Sumner Simpson papers, et al). To bifurcate would require the jury to hear the same evidence twice, not a very economical result.

Plaintiff shall submit an appropriate order on the punitive damages issue.