WESLEY THEOLOGICAL SEMINARY OF THE UNITED METHODIST CHURCH, Appellant,

v.

UNITED STATES GYPSUM COMPANY.

No. 88–7144.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 22, 1989.

Decided May 19, 1989.

**120**

Peter T. Enslein, Washington, D.C., with whom James M. Hanny, Landover, Md., and Michelle A. Parfitt, Washington, D.C., were on the brief, for appellant.

Thomas B. Kenworthy, Philadelphia, Pa., with whom Grace E. Speights, Washington, D.C., was on the brief, for appellee.

Frederick D. Cooke, Jr., Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel, and Lutz Alexander Prager, Asst. Deputy Corp. Counsel, Washington, D.C., were on the brief for amicus curiae, urging reversal and remand.

Before STARR, WILLIAMS and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

A firm or firms that constructed buildings for The Wesley Theological Seminary in 1957–60 used ceiling tiles purchased from the defendant, United States Gypsum Company. The tiles contained asbestos. In early 1984 an industrial hygienist retained by Wesley reported that the ceilings had released asbestos fibers in the past and would do so in the future. Wesley then began a removal program. On May 17, 1985 it filed a diversity action in tort and contract against U.S. Gypsum and others.

Among the defenses invoked by U.S. Gypsum's answer was the then operative version of a statute of repose, D.C.Code § 12–310 (1981). This statute barred certain actions for injury resulting from defective improvements to real property if the *injury* occurred more than 10 years after the improvement's completion. The parties quarrel over whether the statute is a sub-species of statute of limitation or belongs to a different species altogether. We do not enter into this semantic dispute, but we note that the statute is certainly distinct from a conventional statute of limitation in that the bar operates not when the *suit* is filed too late, but when the *"injury"* occurs too late—here, more than 10 years after completion of the improvement. Here, although elements of the analytic chain by which § 12–310 would probably operate to bar the claim are disputed, it seems highly likely that it would have done so but for an amendment (to be discussed shortly) that was enacted in 1987. First, there is at least a very strong argument that for purposes of § 12–310 no "injury" occurred until after the passage of 10 years. *Cf. Bussineau v. President and Directors of Georgetown College*, 518 A.2d 423, 425, 428, 435 (D.C.1986) (equating accrual of a cause of action for statute of limitation purposes with occurrence of "injury" and requiring that the injury be discoverable with reasonable diligence). Second, under the decision of the Court of Appeals of the District of Columbia in *J.H. Westerman Co. v. Fireman's Fund Ins. Co.*, 499 A.2d 116 (D.C.1985), the statute protected *manufacturers* of a component of an improvement.

On February 28, 1987, however, District Law 6–202 came into effect, reversing the *Westerman* decision and removing this critical element in U.S. Gypsum's use of § 12–310 as a defense. The amendment made the statute inapplicable to "any manufacturer or supplier of any equipment or machinery or other articles installed in a structure upon real property." D.C. Law 6–202, 34 D.C.R. 527 (1987), *codified at* D.C.Code §§ 12–301, 12–310(b)(2)–(4), (Michie Supp.1988). It was expressly made

applicable to actions pending in a court on July 1, 1986. See D.C.Code § 12–311 note (Michie Supp.1988); D.C. Law 6–202, § 6.

The district court granted partial summary judgment for U.S. Gypsum on Wesley's tort claims, applying the earlier version of D.C.Code § 12–310. The court reasoned that that version conferred on defendant a "substantive" right not to be sued, which vested before 1987, and that therefore any retroactive divestment of its protection would violate defendant's rights under the due process clause of the Fifth Amendment.

The case went to trial on Wesley's breach of warranty claims, and a jury found U.S. Gypsum free of liability. The district court entered judgment accordingly. Wesley argues here that the court erred in invalidating the retroactive amendment of the statute of repose. It also claims error in certain evidentiary rulings, and in the district court's directed verdict against Wesley on the punitive damages component of its contract claim.

We reverse the judgment of the trial court dismissing Wesley's tort claim and affirm in all other respects.

## I. Retroactive Repeal of the Statute of Repose

The parties agree that if § 12–310 were a statute of limitation the due process clause would not prevent the District from extending the period and thereby reviving a cause of action that the statute had expunged. See *International Union of Electrical Workers v. Robbins & Myers, Inc.,* 429 U.S. 229, 97 S.Ct. 441, 50 L.Ed.2d 427 (1976); *Chase Securities Corp. v. Donaldson,* 325 U.S. 304, 65 S.Ct. 1137, 89 L.Ed. 1628 (1945); *Campbell v. Holt,* 115 U.S. 620, 6 S.Ct. 209, 29 L.Ed. 483 (1885). The defendant claims to find in *Chase* and *Campbell* a simple dichotomy between procedure and substance, under which changes in purely procedural provisions may be retroactive while changes in substantive ones may not. This constitutes the major premise of a proposed syllogism.

Defendant would add a minor premise, that statutes of repose are substantive. The desired result follows automatically.

We may in fact resolve this case, however, without classifying the District's statute as substantive or procedural. The cases simply do not support defendant's major premise.

First, the cases upholding retroactive application of amendments of statutes of limitations by no means give the procedure/substance distinction anything like the place that U.S. Gypsum suggests. *Robbins* and *Campbell* do not mention it. *Chase* does so, but in terms that fall far short of establishing defendant's theory. Justice Jackson wrote:

> The abstract logic of the distinction between substantive rights and remedial or procedural rights may not be clear-cut, but it has been found a workable concept to point up the real and valid difference between rules in which stability is of prime importance and those in which flexibility is a more important value.

325 U.S. at 314, 65 S.Ct. at 1142. While the sentence lends some support to defendant's major premise, it reformulates the distinction as being between rules for which "stability" is important and ones for which "flexibility" is critical. Justice Jackson then turned to a lengthy quotation from an opinion written by Justice Holmes as Chief Justice of the Supreme Judicial Court of Massachusetts. After a passage talking of the inexactitude of constitutional restraints, "end[ing] in a penumbra where the Legislature has a certain freedom in fixing the line," [1] Justice Holmes proceeds (in the quotation) to a characteristic statement of an entirely functional test:

> But however that may be, multitudes of cases have recognized the power of the Legislature to call a liability into being where there was none before, if the circumstances were such as to appeal with some strength to the prevailing views of justice, and if the obstacle in the way of the creation seemed small.

*The Roots of a Legal Metaphor,* 15 Hastings Con. Law Q. 81 (1987).

---

**1.** For a discussion of judicial use of the "penumbra" metaphor, see Burr Henly, *'Penumbra':*

325 U.S. at 315, 65 S.Ct. at 1143, quoting *Danforth v. Groton Water Co.,* 178 Mass. 472, 476, 59 N.E. 1033 (1901).

Later decisions have emphatically confirmed Holmes's view of the matter, both in its functionalism and in its hint of the leeway open to legislative bodies. Thus in *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976), the Court approved Congress's creation of an entirely new liability of coal mine operators for death or illness of miners where linked, through a series of stringent presumptions (some of them irrebuttable), to work in an operator's mines, even if the work long antedated the passage of the statute. The Court dealt curtly with the due process objection based on retroactivity, seemingly testing the statute merely for rationality:

> [L]egislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and ... the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.... [O]ur cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations. This is true even though the effect of the legislation is to impose a new duty or liability based on past acts.

428 U.S. at 15–16, 96 S.Ct. at 2892 (citations omitted). And in *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984), the Court sustained the imposition of a novel "withdrawal liability" on employers who withdrew from multi-employer pension plans before the passage of the burden-creating legislation. Again the Court invoked the modest "rationality" standards that it generally applies to "economic" legislation:

> [T]he strong deference accorded legislation in the field of national economic policy is no less applicable when that legislation is applied retroactively. Provided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches....
>
> To be sure ... retroactive legislation does have to meet a burden not faced by legislation that has only future effects.... But that burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose.

467 U.S. at 729–30, 104 S.Ct. at 2717–18.

At this point, therefore, any substance/procedure dichotomy suggested by *Chase* is either completely defunct or, at the very most, establishes procedural rules as a safe harbor within which a legislature may freely make retroactive changes.

Application of *Turner Elkhorn* and *Gray* is not difficult here. We cannot say it is irrational for the District to decide that the losses due to defects in building materials discovered long after installation should fall on the supplier rather than the building's owner. Indeed, defendant makes no claim of irrationality. Moreover, defendant's equities are not especially powerful; the statute of repose became law only in 1972, see Pub.L. No. 92–579, 86 Stat. 1275 (1972), about 12 years after the last building at issue was completed. Thus defendant made the sales without reliance on the statute. See *Turner Elkhorn,* 428 U.S. at 17 & n. 16, 96 S.Ct. at 2893 & n. 16 (discussing relevance of a party's reliance on prior law).

None of this is to deny U.S. Gypsum's arguments that there are real distinctions between a statute of limitation and one of repose. Defendant frames the distinction around the existence of a cause of action, saying that a statute of repose prevents one from ever coming into existence (unless the terms are satisfied), whereas a statute of limitation causes the expiration of an existing cause of action. We think this line of distinction may be somewhat metaphysical. If a statute of limitation extinguishes an undiscoverable cause of action, as some do, one could easily recharacterize it as a statute of repose: so viewed,

it prevents the claim from ever accruing (with discovery, or the possibility of discovery, being a necessary component of accrual). Thus we rest more confidence in the distinction suggested earlier, in terms of the event that *satisfies* the statute (i.e., an injury, for a statute of repose; filing of suit, for a statute of limitation). But we need not tarry with these theoretical points. Even if they proved that statutes of repose were substantive it would not advance our resolution of the constitutional claim.

U.S. Gypsum seeks to distinguish such cases as *Turner Elkhorn* and *Gray* on the ground that the present case is not one "where the legislature is imposing liability for past acts which had not previously been legislatively addressed at all." Appellee's Brief at 12–13. We fail to perceive a distinction of constitutional magnitude between an expectation of nonliability that arises from legislative silence and common law nonliability, and one that arises from the type of affirmative legislative action present in this case. For support the defendant cites *Bradley v. Richmond School Board*, 416 U.S. 696, 720, 94 S.Ct. 2006, 2020, 40 L.Ed.2d 476 (1974), which addresses a quite different issue—the factors a court, confronted with a change in law during the pendency of litigation, should consider in deciding whether to apply the new law in the absence of specific legislative guidance. See *id.* at 710–16, 94 S.Ct. at 2015–19; *United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49 (1801).

Accordingly, we must reverse the district court's decision invalidating the retroactive effectiveness of the statute of repose.

## II.  Evidentiary Rulings

■ Wesley appeals from the district court's decision to exclude certain exhibits and expert testimony that it argues it needed to prove that U.S. Gypsum knowingly concealed the asbestos danger. We affirm the rulings of the district court on substantially the grounds stated and limit our discussion to a single disputed exhibit.

PX–510 is a letter addressed to a U.S. Gypsum executive in 1936, summarizing the results of studies carried out in U.S. Gypsum's plant by a Dr. Leroy Gardner. Dr. Gardner concluded that a serious asbestos dust hazard existed in the plant. He discussed other studies which proposed a maximum safe level of "five million particles of free silica per cubic foot of air." He distinguished silica dust from asbestos dust, however, and concluded that this standard was not necessarily applicable to asbestos dust.

Wesley seeks to treat as a smoking gun the letter's observation that "[t]here is no standard for safe concentration of asbestos dust comparable to the value just given for free silica dust." In context, however, this is simply a statement that, due to the absence of enough research, no one could yet identify the safe level for occupational exposure. Similarly, the letter's discussion of an asbestos dust study which found a 10% asbestosis rate among workers exposed to five million particles per cubic foot of dust was of remote relevance at best. While it suggests that U.S. Gypsum was on notice that the safe level for occupational exposure to asbestos dust on a full-time basis was less than five million particles per cubic foot of air, it does almost nothing to establish Wesley's central thesis—that the defendant was aware that asbestos-containing ceiling tiles, once installed, created hazardous concentrations.

Thus the district court was well within its discretion in ruling the letter unduly prejudicial. Moreover, for any proper purpose the exhibit was cumulative; U.S. Gypsum admitted in its opening statement to the jurors that for years there had been no question that asbestos caused disease at high-level occupational exposures over long periods of time. See Tr. 40.

## III.  Directed Verdict on Punitive Damage Claim

■ The district court entered a directed verdict against Wesley on its claim for punitive damages for the alleged breach of warranty. We doubt that such a direction of verdict could ever be reversible error

where the jury rejects the substantive claim to which the request for punitive damages is appended; exoneration on the substantive claim seems to moot the issue of punitive damages. The court's direction of the verdict in no way reduced the evidence available to the jury. And while inclusion of a charge on punitives might have given a derogatory tinge to the actual evidence, and to the defendant itself, plaintiff had no legal right to any such spillover.

In any event, a directed verdict "is proper only if, viewing the evidence in the light most favorable to the plaintiff and giving him the advantage of every fair and reasonable inference that the evidence may permit, there can be but one reasonable conclusion drawn." *Richardson v. Richardson–Merrell, Inc.,* 857 F.2d 823, 827 (D.C.Cir.1988). Here only one conclusion could have been drawn. If indeed punitive damages are recoverable on a warranty claim, then in order to be entitled to have its punitive damages claim go to the jury, District law required Wesley to offer evidence of conduct "outrageous, characterized by malice, wantonness, gross fraud, recklessness, or willful disregard of the plaintiff's rights." *Sere v. Group Hospitalization, Inc.,* 443 A.2d 33, 37 (D.C.), *cert. denied,* 459 U.S. 912, 103 S.Ct. 221, 74 L.Ed.2d 176 (1982). Plaintiff clearly did not prove that defendant's knowledge of asbestos hazards could justify such a brand on its conduct.[2]

### IV.  CONCLUSION

Although rejecting the errors asserted by plaintiff as to the disputed evidentiary rulings and the partial directed verdict, we must reverse the judgment on account of the dismissal of the tort claim and remand for further proceedings consistent with this opinion.

*So ordered.*

---

**2.** Of course our decision here does not speak to any punitive damages claim that plaintiff may

assert on its tort claim on remand.