Alma M. SEALOVER, individually, and in her capacity as Administratrix of the Estate of Donald Sealover, deceased, Plaintiff,

v.

CAREY CANADA, et al., Defendants.

No. CV–88–0643.

United States District Court,
M.D. Pennsylvania.

April 3, 1992.

John McN. Broaddus, Deborah K. Hines, Shepard A. Hoffman, Connerton, Ray & Simon, Washington, D.C., for plaintiff.

Robert B. Lawler, Beth Evans Valocchi, Wilbraham & Coleman, Philadelphia, Pa., for defendant U.S. Gypsum Co.

James P. Gannon, Barnard and Gannon, Media, Pa., for defendant W.R. Grace & Co.

## MEMORANDUM

McCLURE, District Judge.

### BACKGROUND

Plaintiffs Alma M. Sealover and Donald E. Sealover filed this products liability ac-

tion against defendants W.R. Grace Company, ("W.R. Grace"), United States Gypsum Company ("U.S. Gypsum")[1] among others. Plaintiffs alleged that as a result of Donald Sealover's exposure to asbestos during his sojourn in the Merchant Marines and during his forty-year career as a carpenter, he contracted mesothelioma,[2] asbestosis and other asbestos-related diseases which ultimately led to his death on May 2, 1988. Alma Sealover, acting both individually and as Administratrix of her husband's estate, sought to recover for her husband's illness and for his death.

The trial was bifurcated with the first phase on strict liability only. The first phase of the trial concluded with the jury awarding compensatory damages of $400,-000 to the estate and $210,000 to Alma Sealover. The negligence and punitive damage claims have yet to be tried. Defendants W.R. Grace and U.S. Gypsum have moved to defer indefinitely trial of plaintiff's punitive damage claim.

Before the court are: (1) a motion (Record Document No. 234, filed October 29, 1991) by U.S. Gypsum to bar plaintiffs from proceeding with their punitive damage claim or, in the alternative, to defer indefinitely the trial on punitive damages; (2) a motion (Record Document No. 238, filed November 15, 1991) by W.R. Grace for summary judgment on the punitive damage claim; (3) and a motion by U.S. Gypsum to exclude evidence on punitive damages.[3] For the reasons set forth below, the court will grant all three motions and direct entry of summary judgment in defendants' favor on the punitive damage claims.[4]

**1.** U.S. Gypsum is part of a group of defendants, affiliated for purposes of defending actions such as this, which are known as the Center for Claims Resolution Defendants or "CCR defendants." The other defendants which are part of that group are:
  (a) GAF Corporation
  (b) National Gypsum Company and
  (c) Turner & Newall
Of the four, plaintiff seeks punitive damages only against U.S. Gypsum. (Record Document No. 232, filed Sept. 11, 1991)

**2.** Mesothelioma is a terminal cancer of the lining of the lung.

## DISCUSSION

### Summary judgment standard

The parties have agreed that the court should treat the motions to bar plaintiff from trying the punitive damage claim as a motion for partial summary judgment. We will, therefore, apply the summary judgment standard in determining the sufficiency of plaintiff's evidence.

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that *there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*" Fed. R.Civ.P. 56(c) (Emphasis supplied).

> ... [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, an on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

**3.** Also outstanding are plaintiff's motion for delay damages; defendants' motions for a new trial or j.n.o.v.; plaintiff's motion to sever the case against GAF; and defendants' motions to treat Johns–Manville as a settled defendant and mold the verdict. These motions will be addressed in a separate memorandum.

**4.** The parties have agreed that the court should treat the motions filed by W.R. Grace and U.S. Gypsum as motions for summary judgment on plaintiff's punitive damage claims.

The moving party bears the initial responsibility of stating the basis for its motions and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. He or she can discharge that burden by "showing ... that there is an absence of evidence to support the nonmoving party's case." *Celotex, supra,* 477 U.S. at 323 and 325, 106 S.Ct. at 2553–54.

Issues of fact are "genuine only if a reasonable jury, considering the evidence presented, could find for the non-moving party." *Childers v. Joseph,* 842 F.2d 689, 694 (3d Cir.1988), citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Material facts are those which will affect the outcome of the trial under governing law. *Anderson, supra,* 477 U.S. at 248, 106 S.Ct. at 2510. In determining whether an issue of material fact exists, the court must consider all evidence in the light most favorable to the non-moving party. *White v. Westinghouse Electric Company,* 862 F.2d 56, 59 (3d Cir.1988).

*Evidentiary issues*

Defendants contend that: (1) plaintiff will be unable to meet the high standard of proof Pennsylvania law requires for an award of punitive damages; (2) plaintiffs in personal injury asbestos actions have in the past been unable to muster such evidence and the Pennsylvania courts [5] have consistently precluded plaintiffs from proceeding to trial on punitive damage claims; and (3) the plaintiff in this case has offered no new evidence which would warrant this court reaching a different conclusion.

In *Martin v. Johns–Manville Corp.,* 508 Pa. 154, 494 A.2d 1088, 1096 (1985), the Pennsylvania Supreme Court held that to recover punitive damages, a plaintiff must show, by a preponderance of the evidence,[6] that the defendant's conduct met the re-

quirements of Section 908(2) of the *Restatement (Second) of Torts:*

> (2) Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant.

The court's holding was stated in a plurality opinion written by Justice Hutchinson. Justice Hutchinson rejected a constructive knowledge (i.e. reasonable man) standard in favor of a standard requiring actual knowledge of the hazard on the part of the defendant. Although a majority of the other justices joined in the result, they did not specifically adopt the actual knowledge standard endorsed by Hutchinson, generating confusion as to the appropriate standard.

In *Burke v. Maasen,* 904 F.2d 178, 181 (3d Cir.1990), the Third Circuit analyzed in considerable detail the state of Pennsylvania law on punitive damages:

> ... [the plurality in *Martin*] held that a jury may award punitive damages only where the evidence shows the defendant knows, or has reason to know, of facts which create a high degree of risk of physical harm to another, and deliberately proceeds to act in conscious disregard of, or indifference to, that risk.... (Citation omitted.) ... [I]t is not sufficient to show that a reasonable person in the defendant's position would have realized or appreciated the high degree of risk from his actions ... (Citation omitted.) ... The *Martin* plurality opinion rejects Restatement § 500's general definition of 'reckless *disregard* of safety' as the standard for imposition of punitive dam-

---

5. All parties agree that Pennsylvania law applies under *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) and its progeny.

6. Although some courts require a higher standard of proof, the Pennsylvania courts have rejected that approach and require plaintiff to prove entitlement to punitive damages by a pre-

ponderance of the evidence only. *Martin, supra,* 494 A.2d at 1098 n. 14 ("We believe the goal of limiting punitive damage awards in the context of products liability litigation is best served by focusing on the nature of the defendant's conduct instead of increasing the plaintiff's burden of persuasion.")

ages. That section states, 'In order that an actor's conduct may be reckless, it is not necessary that he himself recognize it as being extremely dangerous.... It is enough that he knows or has reason to know of circumstances which would bring home to the realization of the ordinary reasonable man the highly dangerous character of his conduct.' ... Restatement § 500, comment c. Instead, *Martin* requires the more culpable mental state of conscious indifference to another's safety as the test for mental state of conscious indifference to another's safety as the test for 'reckless *indifference*' under Restatement § 908. There must be some evidence that the person actually realized the risk and acted in conscious disregard or indifference to it.... (Citation omitted.) ...

The opinion announcing the judgment of the court in *Martin* is not clearly the law of Pennsylvania on this issue. Only Justices Hutchinson and Flaherty joined in the reasoning of the plurality opinion.... Thus, a majority of the Supreme Court has not decided whether punitive damages may be awarded only where there is proof of conscious disregard of a known risk, or whether disregard of a risk that would be obvious to a reasonable person would suffice.... [I]n subsequent cases, Pennsylvania's Superior Court has not applied a 'reasonable man' standard, but followed the lead of Justices Hutchinson and Flaherty, adopting and applying the 'conscious disregard' formulation.... (Citations omitted.).... [T]he rule of the opinion announcing the judgment of the court in *Martin* furthers the purpose of punitive damages, which is to punish and deter 'conduct involving some element of outrage similar to that usually found in crime.' ....In sum, we predict the Pennsylvania Supreme Court would adopt the standard set forth in the *Martin* plurality opinion were it to confront the issue today.

*Burke, supra*, 904 F.2d at 181 (Emphasis original). Accord: *Villari v. Terminix International, Inc.*, 663 F.Supp. 727, 734 (E.D.Pa.1987).

The only post-*Martin* Pennsylvania Supreme Court decision on this issue is *SHV Coal, Inc. v. Continental Grain Co.*, 526 Pa. 489, 493, 587 A.2d 702, 704–05 (1990). There, the Court excerpted the portion of the Hutchinson opinion in *Martin, supra,* which adopts the actual knowledge standard. *SHV Coal,* coupled with the Third Circuit's analysis in *Burke, supra,* leave no doubt that the actual knowledge standard applies to this case. See also: *Tunis Brothers Company, Inc. v. Ford Motor Company*, 952 F.2d 715, 740 (3d Cir.1991).

■ Thus, to recover, Sealover must prove that W.R. Grace and U.S. Gypsum were aware, prior to Donald Sealover's exposure, that the exposure of construction workers to asbestos released during the installation of their products was a health hazard and failed to warn of that risk.

In *Smith v. Celotex Corp.*, 387 Pa.Super. 340, 564 A.2d 209, 211–13 (1989), the Pennsylvania Superior Court discussed the quantum of evidence necessary to prove such knowledge. Using *Martin* as the foundation for its analysis, the court stated:

The evidence deemed insufficient in *Martin* was testimony by two doctors concerning what the medical profession knew of the risks posed to appliers of finished asbestos products and when they knew it.... **Justice Hutchinson ... emphasized that plaintiff had not produced sufficient evidence of the awareness of the defendants of the specific risks associated with application of finished asbestos products, as opposed to risks associated with the manufacture of asbestos products.** Justice Hutchinson distinguished those cases where the plaintiffs were employees of manufacturers of asbestos products and produced evidence of the specific knowledge of the defendants as to the risks posed to manufacturing employees such as the plaintiffs long before the defendants took any measures to protect the employees. See, e.g. *Neal v. Carey Canadian Mines, Inc.*, 662 F.Supp. 64, 70–71 (E.D.Pa.1987).

*Smith, supra,* 564 A.2d at 211 (Emphasis supplied.) Finding such evidence lacking, the Superior Court reversed the jury's award of punitive damages, stating:

> [h]ere, the evidence submitted ... did not establish either that the management of appellant knew or had reason to know of facts indicating that appellant's conduct posed a substantial risk of physical harm to an applier of finished products like plaintiff.... **There is no [medical] testimony specifically relating to knowledge by the medical profession as to the risks posed by finished asbestos products to those who installed or applied them.** We, therefore, conclude that Dr. Sturgis offered no testimony in any way probative of outrageous conduct by appellant vis-a-vis plaintiff.

*Smith, supra,* 564 A.2d at 211. (Emphasis supplied.) The court dismissed as immaterial evidence of workmen's compensation claims filed against the manufacturer, explaining that:

> [t]he existence of those claims alone, with no evidence demonstrating anything relating to how they were ultimately resolved, does not indicate anything regarding appellants knowledge of the risks posed to appliers of asbestos products for numerous reasons. **Most importantly, we note that the claimants were manufacturing employees and not appliers. Thus we do not see how the mere fact that these workers' compensation claims were made is relevant to plaintiff's punitive damages claim.**

*Smith, supra,* 564 A.2d at 212 (Emphasis supplied.). See also: *Catasaugua Area School District v. Raymark Industries, Inc.,* 662 F.Supp. 64, 70–71 (E.D.Pa.1987) (evidence of punitive damages insufficient where plaintiff failed to demonstrate defendant's awareness of risks associated specifically with the installation of finished asbestos products in schools).

In *Moran v. G. & W.H. Corson, Inc.,* 402 Pa.Super. 101, 586 A.2d 416, 422–26 (1991), the outcome was the same. The Pennsylvania Superior Court overturned a verdict assessing punitive damages against Corson, finding insufficient evidence that Corson, an asbestos supplier, was aware of the hazard asbestos posed to construction workers prior to the exposure of plaintiff's husband. There was, the court stated, "no support in the record for the assertion that officials or managerial employees of G. & W.H. Corson were aware in the mid 60's that exposure to asbestos fibers could result in cancer." Plaintiff had attempted to prove such knowledge through: (1) testimony from G. & W.H. Corson Vice President John Evans about general discussions he had, prior to 1969, with business colleagues about the hazards of asbestos; (2) Evans's testimony that he took no action to relay this information to his customers or warn them of the potential danger, but relied instead on the manufacturer, Baldwin Hill, to take such action; (3) Evans's testimony that he had never discussed the issue of asbestos with Baldwin Hill; and (4) articles about the hazards of asbestos published in medical and trade journals circulated in Europe and the United States since the turn-of-the-century. Noting, among other things, the absence of any proof that "anyone at Corson knew or had reason to know of these articles or any medical research studies on the risks involved in the use of insulation materials containing asbestos", the Superior Court found that such evidence did not prove knowledge on the part of Corson that asbestos exposure posed a threat to Moran. *Moran, supra,* 586 A.2d at 425.

Pennsylvania is not unique in adhering to the "actual knowledge" standard. Missouri follows the same standard and its courts have likewise rejected punitive damage claims against asbestos suppliers and manufacturers in cases in which there was insufficient evidence that the defendant *actually knew* that even exposure to *relatively* moderate levels of asbestos posed a serious health risk. In *Angotti v. Celotex Corp.,* 812 S.W.2d 742 (Mo.Ct.App.1991), the Missouri Court of Appeals found insufficient evidence that Celotex actually knew, at the time of plaintiff's exposure, of the hazard asbestos posed to construction workers, stating:

> ....The record here shows that information in regard to the harmful effect of

asbestos was still developing, but it does not establish that, at the relevant times ... there was already information available to show that Philip Carey's finished products were actually known to present a health hazard to insulators. In other words, **the record does not reflect that scientific knowledge even existed, at the relevant times [from 1951 through 1973] ... to establish legal causation sufficient to submit punitive damages against Celotex for the injuries of William Angotti as a result of his exposure, as an insulator, to Celotex's products.** Without even a showing of scientific knowledge sufficient to establish legal causation, Celotex can not be held to have had actual knowledge of the danger to William Angotti on the basis of the record in this case.

*Angotti, supra,* 812 S.W.2d at 746–47. See also: *School District of the City of Independence v. U.S. Gypsum,* 750 S.W.2d 442, 446–48 (Mo.Ct.App.1988), (Court found insufficient evidence that U.S. Gypsum had actual knowledge at the time of sale that the ceiling tiles sold for installation in schools would release asbestos fibers if abraded [rubbed against or scraped], thereby posing a health risk to school employees and students).

### Evidence proffered by Sealover

Plaintiff's principal witness on Sealover's exposure to defendants' asbestos products was Martin Brehm. Brehm was Sealover's brother-in-law and, like Sealover, worked as a carpenter in the Harrisburg, Pennsylvania area. Brehm and Sealover worked on the same construction projects on several occasions during the late 1950's and early 1960's. It was during that time that Sealover was exposed to defendants' asbestos products. Brehm testified that Sealover was exposed to (1) Zonolite, a W.R. Grace fireproofing spray,[7] during construction of the Cumberland County Courthouse in Carlisle, Pennsylvania in 1960–61;[8] (2) Red Top plaster, a U.S. Gypsum product, and to Zonolite, during construction of the Archives Building in Harrisburg, Pennsylvania in 1961–62;[9] and (3) Red Top plaster, during construction of the William Penn Museum[10] in Harrisburg, Pennsylvania in 1962–61.[11] As a carpenter, Donald Sealover was not involved in the actual installation of asbestos products, but worked near locations where such products were used.

To recover on her punitive damage claim, the plaintiff must prove that W.R. Grace and U.S. Gypsum had actual knowledge, before 1960 and 1961 respectively, that the installation of their products presented a serious health risk to construction bystanders and failed to warn of the danger.

Plaintiff bases her case against U.S. Gypsum on information derived from two sources:[12] (1) experiments performed on animals at Lake Saranac laboratory in New York during the 1930's by Dr. Leroy Gardner and the reports generated by those experiments (the "Lake Saranac" evidence); and (2) a suit filed by a bookkeeper formerly employed in one of its plants who alleged that he had contracted asbestosis as a result of working in an asbestos plant.[13]

7. W.R. Grace acquired the assets of the Zonolite Company in April, 1963 and argues that punitive damages should not be assessed against it because it was not a manufacturer of asbestos products prior to 1963. Plaintiff argues W.R. Grace is liable as a successor corporation to Zonolite. Our ruling on the sufficiency of the evidence disposes of plaintiff's claim and eliminates the need to consider this issue.

8. N.T., July 8, 1991, pp. 23–31 and 64 (Brehm, M.).

9. N.T., July 8, 1991, pp. 32–35, 38–39 (Brehm, M.).

10. N.T., July 8, 1991, pp. 36–41, (Brehm, M.).

11. Brehm testified that Sealover was also exposed to Gold Bond products manufactured by National Gypsum on the three construction projects: the Cumberland County Courthouse, the Archives Building in Harrisburg, and the William Penn Museum. Plaintiff is not seeking punitive damages against National Gypsum.

12. We assume, without deciding, that for purposes of ruling on defendants' motions, that all evidence which plaintiff proffers would be admissible at trial.

13. The bookkeeper worked at an asbestos factory owned by the National Asbestos Manufacturing Co., and the suit was filed against that company. U.S. Gypsum plant acquired the factory in 1936.

Plaintiff bases her case against W.R. Grace on the Lake Saranac evidence as well as on other information allegedly available to it through its acquisition of two companies in the 1950's and 1960's. W.R. Grace did not become involved in manufacturing asbestos-containing products until December, 1954 when it acquired the Dewey and Almy Chemical Company ("Dewey and Almy").[14] Dewey and Almy had been involved in manufacturing products which incorporated asbestos since the 1930's when its acquired Multibestos, a company which manufactured brake linings. During the 1930's, Multibestos plant employees exhibited symptoms of asbestosis and their conditions and symptoms were reported in two articles published in medical journals.

In April of 1963, W.R. Grace acquired a second company involved with asbestos products, the Zonolite Company ("Zonolite"). Zonolite operated a vermiculite mine in Libby, Montana, a vermiculite mine in South Carolina, and several processing plants at which the ores mined at Libby were used to manufacture fireproof plaster, among other products.

The vermiculite ore mined at Libby was contaminated with asbestos, and Zonolite employees' had exhibited problems stemming from their exposure to asbestos during mining and processing operations. Zonolite was aware of such problems since at least the early 1950's, when it implemented regulations requiring Libby employees to wear respirators. Despite precautionary measures, such as the use of respirators, x-rays of Libby employees taken in the late 1950's revealed a high incidence of abnormal lung conditions. The conditions observed included pleural thickening, interstitial fibrosis and pneumonocosis or possible asbestosis. Troubling dust conditions in the Libby mine were noted and reported by public health officials. For example, a report generated during a 1956 inspection of the Libby mine by the Montana Board of Health found "the asbestos dust in the air" to be "of considerable toxicity."

*Saranac Lake experiments*

■ The Saranac Lake experiments are the cornerstone of plaintiff's case against U.S. Gypsum. The experiments were performed in the late 1930's and the early 1940's by Dr. Leroy Gardner. Dr. Gardner exposed to mice, rabbits, cats and other animals to asbestos dust and other types of dust and documented the effect on their lungs. His initial intent was to study whether the animals exposed to asbestos developed asbestosis, the conditions under which it developed, etc. He was surprised when the results in mice revealed a high incidence of lung tumors which he believed to be cancerous. The population of mice exposed to the asbestos dust was small, numbering only eleven.

The significance of certain aspects of Dr. Gardner's experiments is vigorously disputed, but one point is clear. The experiments did not establish a definite causal relationship between asbestos exposure at levels comparable to those experienced by construction bystanders and cancer. Dr. Gardner found only a possible relationship between exposure to massive amounts of asbestos and malignant tumors of the lung in white mice. He himself stated that the implications were unclear and that the matter required further study before any clear conclusions could be drawn.

Further, possible flaws in the methodology were identified by Dr. Gardner and by others who later reviewed the results. Among the flaws was the fact that the strain of white mice studied was thought to be particularly susceptible to lung tumors. In February of 1943, Dr. Gardner released an "Outline of Proposed Monograph on Asbestosis", in which he characterized the significance of his findings as follows:

> These observations are suggestive **but not conclusive evidence of a cancer stimulating action by asbestos dust.** They are open to several criticisms. The strain of mice was not the same in the

**14.** Because we find the evidence proffered by plaintiff legally insufficient, we need not address W.R. Grace's contention that it cannot be held liable for punitive damages as a successor corporation to Zonolite, the corporation which manufactured the asbestos products to which Sealover was exposed.

asbestos experiment as in many of the other cited; apparently, the former were unusually susceptible. Not enough animals survived in the dust for longer than the 15 months apparently necessary to produce many tumors. **There were no unexposed controls of the same strain and age, and no similar controls exposed to other dusts. It is hoped that this experiment can be repeated under properly controlled conditions to determine whether asbestos actually favors cancer of the lung.**

(Record Document No. 245, filed December 11, 1991, p. 19 referencing plaintiff's exhibit USG–152 at 126–66–(7) through 126–66–(8) (emphasis supplied)). See generally: *Angotti, supra,* 812 S.W.2d at 746–49 (Responding to the alleged significance of a prediction by a physician working for the company that someday " 'even the minor use of asbestos may ... be considered ... dangerous to the general populace' ", the court stated: "A forecast of what may be determined in the future does not establish present knowledge that a health hazard existed for those working as insulators.")

In a letter and report to Johns–Manville dated February 24, 1943, Dr. Gardner again described the results as inconclusive and noted the need for further study on the question of a possible link to cancer:

The question of cancer susceptibility now seems more significant than I previously imagined. I believe I can obtain support for repeating it from the cancer research group. As it will take two or three years to complete such a study, I believe it would be better to be omitted from the present report. If it should become possible to make this study, I hope I any [sic] count on some of your members to supply me with enough pure, long fiber asbestos for the purpose ...

(Record Document No. 245, filed December 11, 1991, p. 23, referencing plaintiff's exhibit USG–152 at 126–66–(7) through 126–66–(8)).

Plaintiff argues that the results of the Saranac Lake research were more definite than this and, as support for that assertion, points to a statement in a letter dated August 13, 1936 from W.L. Keady, a U.S. Gypsum executive. Keady summarizes the contents of a report by Dr. Gardner on conditions at a Jersey City plant which U.S. Gypsum had purchased from another asbestos manufacturer. Dr. Keady states at one point that "there was no safe level of exposure to asbestos." Plaintiff argues that, by this, he meant that exposure to any amount of asbestos, however minute, posed a hazard. Plaintiff's interpretation is inconsistent with the rest of the passage. The entire passage reads:

Dr. Gardner points out that various authorities have tentatively suggested a concentration of five million particles of free silica per cubic foot of air as limits above which a silicosis hazard might exist; and this value has met with some recognition. There is no standard for safe concentration of asbestos dust comparable to the value just given for free silica dust.

(Record Document No. 245, filed December 11, 1991, Exhibit "N").

We are not the first court to consider the import of the Keady letter. The Court of Appeals for the District of Columbia Circuit considered the letter in *Wesley Theological Seminary v. U.S. Gypsum Co.,* 876 F.2d 119, 123 (D.C.Cir.1989), and rejected plaintiff's proposed interpretation. The court explained:

Dr. Gardner concluded that a serious asbestos dust hazard existed in the plant. He discussed other studies which proposed a maximum safe level of 'five million particles of free silica per cubic foot of air.' He distinguished silica duct from asbestos dust, however, and concluded that this standard was not necessarily applicable to asbestos dust.

**Wesley seeks to treat as a smoking gun the letter's observation that '[t]here is no standard for safe concentration of asbestos dust comparable to the value just given for free silica dust.' In context, however, this is simply a statement that, due to the absence of enough research, no one could yet identify the safe level for occupational exposure. Similarly, the letter's discussion of an**

asbestos dust study which found a 10% asbestosis rate among workers exposed to five million particles per cubic foot of dust was of remote relevance at best. While it suggests that U.S. Gypsum was on notice that the safe level for occupational exposure to asbestos dust on a full-time basis was less than five million particles per cubic foot of air, it does almost nothing to establish Wesley's central thesis—that the defendant was aware that asbestos-containing ceiling tiles, once installed, created hazardous concentrations.

*Wesley Theological, supra,* 876 F.2d at 123 (Emphasis supplied.)

We are aware of the controversy concerning the alleged attempts of the Saranac study sponsors, a group of asbestos manufacturers which included U.S. Gypsum, to conceal the suspected link to cancer revealed by Dr. Gardner's study. It is not clear from the documents we have reviewed that U.S. Gypsum knowingly participated in any conspiracy to conceal the results by pressuring Dr. Gardner or his successors to omit any mention of cancer from the published reports of the study. This distinguishes its position from that of other asbestos manufacturers, such as Johns–Manville, with respect to which there is clear direct evidence of knowing participation in efforts to block publication of results linking asbestos-exposure in animals to cancer. Moreover, the Pennsylvania courts have found even such knowing participation an insufficient basis for imposing punitive damages. See: *Martin, supra,* and *Angotti, supra,* 812 S.W.2d at 746–49 (Efforts to keep a medical advisor's "observations and evaluation confidential does not show actual knowledge of a health hazard to an individual working as an insulator.") Cf. *Neal v. Carey Canadian Mines, Ltd.,* 548 F.Supp. 357, 365 (E.D.Pa. 1982).

Plaintiff has not pointed to any evidence that U.S. Gypsum was directly or knowingly involved in attempts to conceal Dr. Gard-

ner's finding of a suspected cancer link or to curtail publication of his findings. The Lake Saranac experiments were sponsored by a group of asbestos manufacturers which included U.S. Gypsum.[15] Dr. Gardner was in contact with officers of Johns–Manville and Raybestos–Manhattan about his experiments, and such evidence, as well as attempts by the principals of those companies to suppress the study results, has been the basis for an award of punitive damages against them in a number of cases. Plaintiff has not, however, directed our attention to any evidence similarly linking U.S. Gypsum to efforts to conceal the results or to pressure Dr. Gardner or his successors to limit publication of their findings. Without such direct evidence, U.S. Gypsum cannot be tarred with the same brush as Raybestos or Johns–Manville.

Further, without the underpinnings of evidence establishing actual knowledge of the hazard asbestos posed to those who even indirectly came into contact with their products, plaintiff's evidence of alleged attempts to conceal the Saranac Lake experiments, as well as its alleged failure to use alternatives to asbestos has no probative value. Such evidence alone does not establish culpable conduct.

*U.S. Gypsum employee*

The other evidence on which plaintiff relies to establish actual knowledge on the part of U.S. Gypsum is evidence that in the 1930's a bookkeeper employed at one of its manufacturing plants in Jersey City, New Jersey contracted asbestosis as a result of his employment. Plaintiff argues that this proves U.S. Gypsum knew that exposure to even relatively moderate levels of asbestos posed a significant health hazard. Such evidence does not equate to knowledge that construction bystanders were at risk. As the court pointed out in *Angotti, supra,* asbestos-plant workers were exposed to far greater quantities of asbestos dust than the average construction worker, because their work environments differed. The manufacturing processes generated enor-

---

**15.** W.R. Grace was not one of the sponsors. At the time the experiments were conducted, it was not involved in the mining or processing of asbestos. It did not acquire asbestos-related industries until the 1950's.

mous quantities of dust. Day-after-day, each worker labored in the same location and was exposed to the same, extremely dusty conditions. Ventilation was ofttimes non-existent during the early manufacturing days, and the worker had no reprieve from the repetitive accumulation of asbestos dust. Knowledge that workers laboring under such conditions suffered from a cumulative exposure to asbestos cannot be equated with knowledge that construction workers, presumably laboring under less disagreeable conditions and less dusty conditions [16] would suffer the same ill-effects to the same degree. In *Angotti, supra,* the court commented:

> ... While there was evidence that sawing of asbestos products by insulators produced dust in varying degrees, depending on the type of material and the size of the cut, **there was no evidence to show that the exposure of the plant employees with asbestosis was to the same degree as the exposure of an insulator. There are many products and environmental conditions that are known to create a health hazard to individuals exposed to a given degree which do not create a hazard to one exposed to a lesser degree....**

> .... **[T]he fact that workers at the Philip Carey plant exposed to high volumes of asbestos dust within the manufacturing process contracted asbestosis does not show actual knowledge by Philip Carey that a health hazard existed from the exposure of an insulator, who did not work in the manufacturing process and within the confines of its plant, but who worked with its finished products.** The evidence did not establish that Philip Carey had actual knowledge that insulators were exposed to a dangerous level of asbestos fibers by use of their products or that Philip Carey was put on notice and consciously chose to ignore information that showed its products were actually known to be harmful to insulators.

*Angotti, supra,* 812 S.W.2d at 747–748 (Emphasis supplied.). See also: *Martin, supra,* 494 A.2d at 1099 n. 15 (noting the distinction between articles and research studying the risks associated with mining and manufacturing raw asbestos and the risks associated with installing or applying asbestos-containing products), and *Smith, supra,* 564 A.2d at 212. Clearly, then, evidence that U.S. Gypsum was on notice that a bookkeeper in one of its manufacturing plants contracted asbestosis does not equate to knowledge that construction bystanders, such as Donald Sealover, were equally at risk.

### Libby mine workers

Of all of the evidence which plaintiff proffers against W.R. Grace, that which brings her closest to proving actual knowledge of the hazard asbestos posed to construction workers is proof that the workers who experienced problems were, purportedly, exposed to only relatively small amounts of asbestos contained in the vermiculite. Plaintiff argues that this served as notice that even casual or indirect exposure to relatively small amounts of asbestos can cause serious lung problems. She contends that this also distinguishes this case from others decided by the Pennsylvania courts in which the courts refused to equate long-standing knowledge of lung problems in plant workers with knowledge that asbestos would have an equally devastating effect on construction workers exposed to lesser quantities and lower concentrations.[17] See, e.g., *Neal v. Carey Canadian Mines* and *Martin, supra.* The conclusion which plaintiff seeks to draw from the problems experienced by the Libby mine and plant workers does not follow. Knowledge of their health problems does not equate under Pennsylvania law to actual knowledge that construction bystanders would suffer like problems from exposure on construction sites to asbestos-containing products. It stands to reason that exposure during the manufacturing process and during mining, when asbestos-containing

---

**16.** See, e.g., Record Document No. 245, filed December 11, 1991, referencing plaintiff's exhibit USG–16 at p. 2.

**17.** (See: Record Document No. 248, filed December 11, 1991 at p. 17. Emphasis supplied.)

raw materials were being crushed, sorted, and otherwise manipulated, would pose a greater risk of more extensive exposure than would the installation of the manufactured product. See, e.g. *Angotti, supra,* 812 S.W.2d at 746–49 ("[A]rticles from medical literature relating to the 'hazards of asbestos exposure in industrial employment, and to the surrounding population.' .... and warnings by a medical advisor of 'possible liability to persons other than employees' does not establish actual knowledge and it does not establish that information was available to show that ... [defendant's] products were actually known to constitute a health hazard to insulators."). Further, the reports upon which plaintiff relies indicate that workers and miners were exposed to a large volume of dust. For example, a 1956 report from the Montana Board of Health states: "dust vibrates almost continuously off the rafters which have become loaded and are continuously loaded with dust generating from many sources." (Record Document No. 248, filed December 11, 1991 at p. 22, referencing W.R. Grace Exhibit 2). A letter written in 1961 by a Zonolite official expresses similar concerns, stating: "There is a relatively large amount of asbestos dust present in our mill and this is difficult to control." (Record Document No. 248, filed December 11, 1991 at p. 23). Thus, even though the dust workers were exposed to may have contained only trace amounts of asbestos, the fact that it was generated continuously and allowed to accumulate day after day distinguishes their situation from that of construction workers, where one would reasonably expect the volume of dust to be less. Once installation was completed installers move to a new location, so that one would assume that there is not the same opportunity for dust to accumulate day after day in the same location and endanger the health of bystanders. Cf. *Wammock v. Celotex Corp.,* 835 F.2d 818, 822 (11th Cir.1988) (punitive damages award against National Gypsum upheld based, *inter alia* on evidence that National Gypsum was aware of hazards asbestos exposure posed to miners, plant workers and others exposed to high concentrations of the dust and could be found to be "consciously indifferent" to the threat posed to construction workers by failing to act on that information to protect such workers from exposure).

### Post–1961–1962 evidence

■ Plaintiff's reliance on post–1961–1962 evidence is misplaced. Evidence that W.R. Grace and U.S. Gypsum learned of the hazards of asbestos sometime after Sealover's exposure is in no way probative of what they actually knew prior to Sealover's exposure. Although such evidence is relevant in some cases, depending upon the claims raised, it is not relevant to the issues before this court. Cf. *Rowan County Board of Education v. U.S. Gypsum,* 103 N.C.App. 288, 407 S.E.2d 860 (1991) (post-exposure evidence relevant to refute defendant's assertions that asbestos ceiling tiles it marketed were suitable for installation in schools) and *Eagle–Picher Industries, Inc. v. Balbos,* 84 Md.App. 10, 578 A.2d 228, 249–50 (1990) (post-exposure evidence relevant to prove a duty to alert plaintiff after exposure and avert possibility of him worsening his condition by continuing to smoke cigarettes and/or to prompt the persons exposed to seek treatment earlier and thereby perhaps prolong their lives).

### Cases cited by plaintiff

Plaintiff urges the court to follow *Ivins v. Celotex Corporation,* 115 F.R.D. 159 (E.D.Pa.1986), in which Judge Newcomer found the Saranac documents sufficient to support a claim for punitive damages against Owens–Illinois and Owens Corning Fiberglas. *Ivins* is inapposite, because the court did not follow what we now know to be the Pennsylvania standard for imposing punitive damages. Although the court stated that liability had been established under both *Martin* and the line of cases which preceded it (cases which did not require the plaintiff to prove actual knowledge), its holding was framed in terms of what the defendants should have or could have inferred from the Saranac findings, not in terms of what they actually knew

about the effect of asbestos on construction workers. The court stated:

> [T]he Saranac documents could indicate that Owens–Illinois and OCF had knowledge of the danger sometime between 1948 and 1958. Second ... testimony with respect to OCF's familiarity with asbestos and the contemplated publication of the 'asbestos file' may support the inference that OCF was aware of the hazards of asbestos in mining and factory settings. Such evidence could also show that OCF knew or should have known of such facts as would cause a reasonable person to realize the existence of a serious danger. Since plaintiffs' proofs may support the inference that defendant OCF—long before it took ameliorative action—(1) knew of the risks associated with asbestos or (2) knew or should have known of facts which would cause a reasonable person to realize that exposure to asbestos caused significant health risks, it would be inappropriate to dismiss plaintiff's claim for punitive damages as a matter of law.

*Ivins, supra*, 115 F.R.D. at 166.

*City of Greenville v. W.R. Grace & Co.*, 827 F.2d 975, 981–83 (4th Cir.1987) is distinguishable on its facts. The City of Greenville, South Carolina sued W.R. Grace to recover the cost of removing a fireproofing product called Monokote from the Greenville City Hall. The city was awarded compensatory and punitive damages on its negligence and breach of warranty claims. On appeal, the award was upheld by the Fourth Circuit Court of Appeals. Unlike the case before us, W.R. Grace sold the asbestos-containing Monokote to Greenville in 1971 to 1972, at a time when it was fully aware of the hazards associated with asbestos products, knew that the asbestos-containing Monokote was not suitable for the purposes for which it was sold because of its tendency not to bond to the surfaces to which it was applied, and, acting in response to well-publicized concerns about the health risks associated with asbestos exposure, had developed and was marketing commercially a non-asbestos Monokote product.

*Repeated punitive damage awards*

Defendants raise several policy reasons for not permitting punitive damages in this case, which we will address briefly. Defendants cite: (1) the compensatory and punitive damage judgments assessed against them in prior cases; (2) pending asbestos claims;[18] (3) the dire financial straits of other asbestos manufacturers as reasons for disallowing punitive damages in this case; and the fact that plaintiff has been fully compensated for her injuries. They argue under the circumstances, subjecting them to punitive damages would serve no purpose and "unreasonably endanger future litigants' chances to recovery compensatory damages" by further draining defendants' limited financial resources. If their coffers are further depleted by large punitive damage awards in cases such as this, they argue, the injuries of future claims will go uncompensated. Other injured parties, having an equal right to receive full compensation for their losses, will receive nothing. By allowing plaintiffs to proceed to trial on the punitive damage issue, defendants argue, the court would be sanctioning a practice contrary to the interests of other injured parties.

The Third Circuit Court of Appeals has recognized the legitimacy of the concerns which defendants raise. In *In Re School Asbestos Litigation*, 789 F.2d 996, 1003–04 (3d Cir.1986), the court commented on the inappropriateness of punitive damages in mass tort litigation, stating:

> In the era when most tort suits were 'one-against-one' contests, a single act triggered a single punishment. The in-

---

**18.** Untold numbers of asbestos personal injury actions have already been litigated to conclusion and statistics indicate that the stream of litigation is far from waning. Court records indicate that "presently in the federal system nearly two new asbestos actions are being filed for every action terminated, and that at the current rate, there will be more than 48,000 actions pending in the federal courts at the end of three years." *In re: Asbestos Products Liability Litigation (No. VII)*, 771 F.Supp. 415, 418 (J.P.M.L.1991) (citing *Report of the Judicial Conference Ad Hoc Committee on Asbestos Litigation*, 8 (1991)).

creasingly prevalent mass tort situation, however, exposes a defendant to repetitious punishment for the same culpable conduct. The parallels between the assessment of exemplary damages and a fine levied in criminal courts have led to suggestions that the concepts of double jeopardy and excessive punishment should be invoked in the civil field as well.... (Citations omitted.)....

Similar concerns have prompted highly respected judges to comment on the possibility that the due process clause might contain some constitutional limitation on the amount of exemplary damages to be awarded. 'Unlimited multiple punishment for the same act determined in a succession of individual lawsuits and bearing no relation to the defendants' culpability or the actual injuries suffered by victims, would violate the sense of "fundamental fairness" that is essential to constitutional due process.' *In re Federal Skywalk Cases*, 680 F.2d 1175, 1188 (8th Cir.1982) (Heaney, J. dissenting). 'There must, therefore, be some limit, either as a matter of policy or as a matter of due process, to the amount of times defendants may be punished for a single transaction.' *In re 'Agent Orange' Product Liability Litigation*, 100 F.R.D. 718, 728 (1983).

In addition to a possible federal constitutional limitation, state substantive tort law could place restraints on repetitive punitive damage awards....

....

Thus powerful arguments have been made that, as a matter of constitutional law or of substantive tort law, the courts shoulder some responsibility for preventing repeated awards of punitive damages for the same acts or series of acts.

....

... [T]he tens of thousands of personal injury suits in which punitive damage verdicts have been and continue to be assessed ... are satisfied from the same pool of assets to which the school districts now look. If a limit is ever placed on the total punitive damages to be imposed on the asbestos defendants, then that limit probably would apply to all claims whether they arise in property damage or personal injury suits.

....

... [D]espite strong arguments favoring limitations on punitive damages and the increasing number of bankruptcies, the 'business as usual' attitude still prevails.... (Citations omitted.)

*School Asbestos Litigation, supra,* 789 F.2d at 1003–05 and 1007. Although the Third Circuit recognized the need for controls, it has not thus far adopted a rule limiting the number of punitive damage recoveries against a single defendant for a single product or course of action. The United States Supreme Court has also acknowledged that there are Fourteenth Amendment due process constraints on punitive damage awards. *Pacific Mutual Life Insurance Co. v. Haslip,* 499 U.S. ——, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991).

Defendants further argue that allowing plaintiff to proceed with her punitive damage claim would be inconsistent with the order of the Judicial Panel on Multi–District Litigation (the "Panel") dated July 30, 1991 consolidating the pre-trial proceedings of all federal personal injury and wrongful death asbestos cases. In its decision to consolidate, the Panel made reference to concerns along these lines expressed in the March 1991 report of the Judicial Conference Ad Hoc Committee on Asbestos Litigation:

The ... five years [since 1985] have seen ... increased filings, larger backlogs, higher costs, more bankruptcies and poorer prospects that judgments—if ever obtained—can be collected.

....

**The most objectionable aspects of asbestos litigation can be briefly summarized ... exhaustion of assets threatens and distorts the process; and future claimants may lose altogether.**

*In re: Asbestos Products Liability Litigation (No. VI),* 771 F.Supp. 415, 418–19 (J.P.M.L.1991) (quoting *Report of the Judicial Conference Ad Hoc Committee on Asbestos Litigation,* 1–3, 9 (1991)).

Although the defendants raise legitimate concerns, this court is not the proper forum for redress.[19] If restrictions are to be imposed on the number of punitive damage awards which may be assessed against a single defendant for the same product or course of action, they must be established by the Pennsylvania legislature or "a higher judicial authority", but not by this court. See: *Glasscock v. Armstrong Cork Co.*, 946 F.2d 1085, 1096–97 (5th Cir.1991) ("If there is to be further control of repeated punitive damage awards, the solution must be found through legislation."); *King v. Armstrong World Industries, Inc.*, 906 F.2d 1022, 1031–33 (5th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 2236, 114 L.Ed.2d 478 (1991); *McCleary v. Armstrong World Industries, Inc.*, 913 F.2d 257, 260–61 (5th Cir.1990). Cf. *Juzwin v. Amtorg Trading Corp.*, 718 F.Supp. 1233, 1235 (D.N.J.1989) ("[T]his court does not have the power or the authority to prohibit subsequent [punitive damage] awards in other courts notwithstanding its opinion that such subsequent awards violate the due process rights of the defendants against whom such verdicts are entered. Until there is uniformity either through Supreme Court decision or national legislation, this court is powerless to fashion a remedy which will protect the due process rights of this defendant or other defendants similarly situated.") and *Gogol v. Johns–Manville Sales Corp.*, 595 F.Supp. 971, 975–76 (D.N.J.1984).

## ORDER

For the reasons stated in the accompanying memorandum, IT IS ORDERED THAT:

1. The motions [1] (Record Document No. 234, filed October 29, 1991 and Record Document Nos. 245 and 246, filed December 11, 1991) by U.S. Gypsum to bar plaintiffs from proceeding with their punitive damage claim and to exclude evidence of punitive damages are granted.

2. The motion (Record Document No. 238, filed November 15, 1991) by W.R. Grace for summary judgment on plaintiff's punitive damage claim is granted.

3. The parties having agreed that the court should treat the above motions filed by W.R. Grace and U.S. Gypsum as motions for summary judgment on plaintiff's punitive damage claim, summary judgment is granted in defendants' favor on that claim.

4. The Clerk is directed to defer entry of final judgment until further order of court.

---

**19.** Commentators have recognized the legitimacy of these concerns, but have also urged a legislative solution. See: Robert E. Scott, Jr., *Punitive Damages: Constitutionality, Elements and Defense—The Defense Perspective*, 387 PLI 425 (March 1, 1990).

Commentators have urged the need for a restraint on the number of punitive damage awards that may be imposed on any one company for injuries arising from a single product or line of products. See: Jack B. Weinstein and Eileen B. Hershenov, *The Effect of Equity on Mass Tort Law*, 1991 U.Ill.L.Rev. 269 (1991).

**1.** Also outstanding are plaintiff's motion for delay damages; defendants' motions for a new trial or j.n.o.v.; plaintiff's motion to sever the case against GAF; and defendants' motion to treat Johns–Manville as a settled defendant and mold the verdict. These motions will be addressed in a separate memorandum and order.